# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 5, 2015

Lyle W. Cayce
Clerk

No. 14-40048

———

CARLA FREW; CHARLOTTE GARVIN, as next friend of her minor children Johnny Martinez, Brooklyn Garvin and BreAnna Garvin; CLASS MEMBERS; NICOLE CARROLL, Class Representative,

> Plaintiffs - Appellants

v.

KYLE JANEK, Commissioner of the Texas Health and Human Services Commission in his official capacity; KAY GHAHREMANI, State Medicaid Director of the Texas Health and Human Services Commission in her official capacity,

> Defendants - Appellees

———

Appeal from the United States District Court
for the Eastern District of Texas

———

Before JOLLY, WIENER, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

This appeal arises from the district court's termination of several provisions of a consent decree and the dissolution of a related corrective action order pursuant to the first clause of Federal Rule of Civil Procedure 60(b)(5)—that the judgment has been "satisfied, released, or discharged." Plaintiffs represent a class of Texas children eligible for Medicaid's Early and Periodic Screening, Diagnosis, and Treatment program ("EPSDT" or "the Program"). They concluded a consent decree (the "Decree") with various Texas state

No. 14-40048

officials ("Defendants") in 1996 to make improvements to Texas's implementation of the Program. In 2007, the parties agreed on a corrective action order to resolve Plaintiffs' concerns with one part of the Decree. Defendants, believing their obligations to be satisfied, have now moved to dissolve that order and the associated Decree provisions under Rule 60(b)(5). The district court granted their motion. We affirm.

## I.     Facts and Proceedings

### A.     Past Proceedings

This action began in 1993 when Plaintiffs, representatives of a class of over 1.5 million Texas children eligible for EPSDT, sued Defendants under 42 U.S.C. § 1983 for violations of federal Medicaid law in the state's implementation of the Program.[1] As noted, the parties concluded a consent decree in 1996 in which Defendants promised to implement a number of changes, among which was a training program for participating health care providers.[2] A few years later, after little progress had been made, the district court found Defendants in violation of the Decree ("*Frew I*").[3] We reversed, solely on Defendants' challenge to the Decree's validity under the Eleventh Amendment ("*Frew II*").[4] The Supreme Court then reversed *Frew II* ("*Frew III*").

In *Frew III*, the Court noted that Defendants' legitimate concerns over the Decree's potential to "undermine the sovereign interests and accountability of state governments" were not properly addressed to the Eleventh Amendment but to the district court's power, under Rule 60(b)(5), to grant

---

[1] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 434 (2004); *Frew v. Gilbert*, 109 F. Supp. 2d 579, 587 (E.D. Tex. 2000).

[2] *See Frew*, 109 F. Supp. 2d at 588.

[3] *See id.* at 678.

[4] *See Frazar v. Gilbert*, 300 F.3d 530, 543 (5th Cir. 2002).

relief "if 'it is no longer equitable that the judgment should have prospective application.'"[5] The Court reiterated the "flexible standard" for modification of institutional-reform consent decrees[6] found in *Rufo v. Inmates of Suffolk County Jail*[7] and urged district courts to return the "responsibility for discharging the State's obligations" promptly to state officials once "the objects of the decree have been attained."[8]

On remand, we returned the case to the district court ("*Frew IV*").[9] Defendants moved to dissolve the Decree under Rule 60(b)(5)'s third clause, claiming that its continued enforcement would be inequitable.[10] The district court, applying *Rufo* and *Frew III*, denied their motion, and we affirmed ("*Frew V*").[11]

Back in the district court, the parties agreed on eleven corrective action orders, each aimed at bringing Defendants into compliance with a specific portion of the Decree. CAO 637-8, the order at issue in this appeal, implemented ¶¶ 124–30 of the Decree, which concerned deficiencies in Medicaid-participating pharmacies' understanding of EPSDT. All eleven orders were entered into the record in 2007.[12]

**B. Consent Decree ¶¶ 124–30 and CAO 637-8**

*1. Consent Decree ¶¶ 124–30*

The 78-page Decree is organized into 308 paragraphs, of which only 7 are involved in this appeal. Paragraphs 124–30 form one subsection of a larger

---

[5] *Frew*, 540 U.S. at 441 (quoting FED. R. CIV. P. 60(b)(5)).

[6] *Id.*

[7] 502 U.S. 367 (1992).

[8] *Frew*, 540 U.S. at 442.

[9] *See Frazar v. Hawkins*, 376 F.3d 444, 447 (5th Cir. 2004).

[10] *See Frew v. Hawkins*, 401 F. Supp. 2d 619, 631 (E.D. Tex. 2005).

[11] *See Frazar v. Ladd*, 457 F.3d 432, 434 (5th Cir. 2006).

[12] In 2009, the case was transferred by Judge William Wayne Justice, who had overseen the case from its inception, to Judge Richard Schell.

section that calls for a variety of training initiatives for healthcare providers. Of these 7 paragraphs, 2 mandate that Defendants perform specific actions:

> 129. By January 31, 1996, Defendants will implement an initiative to effectively inform pharmacists about EPSDT, and in particular about EPSDT's coverage of items found in pharmacies. The effort will include presentations at meetings of the Texas Pharmaceutical Association and other appropriate organizations, if possible, articles in the TPA newsletter, if possible, and at least one mail out to all pharmacists who participate in the Medicaid program. The mail out will be designed to attract pharmacists' attention, explain EPSDT coverage clearly and encourage pharmacists to provide the full gamut of covered pharmaceutical products to recipients as needed.
>
> 130. By July 31, 1996, Defendants will conduct a professional and valid evaluation of pharmacists' knowledge of EPSDT coverage of items commonly found in pharmacies. They will report the results of the evaluation to Plaintiffs by September 1, 1996. If the parties agree that pharmacists' understanding of the program is acceptable, Defendants will continue the initiative described above to inform pharmacists about EPSDT. If the parties do not agree, or if pharmacists' understanding is unacceptable, Defendants will conduct an initiative to orally inform pharmacists about EPSDT's coverage. Plaintiffs will not unreasonably disagree about whether pharmacists' understanding is acceptable.[13]

Plaintiffs contend that three other paragraphs of the Decree are relevant: ¶ 3, which declares that "[r]ecipients are also entitled to all needed follow up health care services that are permitted by federal Medicaid law"; ¶ 6, which describes the purpose of the Decree as "[t]o address the parties' concerns,

---

[13] Paragraph 124 describes the critical role that pharmacies play in the Program. Paragraph 125 introduces Plaintiffs' complaints: Pharmacists do not understand EPSDT's requirements, such as the fact that over-the-counter medications are covered if prescribed by a doctor. Paragraph 126 states that EPSDT also covers medically necessary infant formula, diapers, and other supplies and equipment "commonly sold in pharmacies." Paragraph 127 continues Plaintiffs' complaints: Pharmacies that do not understand EPSDT require Medicaid recipients to pay in cash; recipients often do not have cash or end up erroneously paying for covered items. Paragraph 128 states Defendants' disagreement with these facts.

to enhance recipients' access to health care, and to foster the improved use of health care services by Texas EPSDT recipients"; and ¶ 190, which states that "EPSDT recipients served by managed care organizations are entitled to timely receipt of the full range of EPSDT services, including but not limited to medical and dental check ups."[14]

### 2.    CAO 637-8

This corrective action order begins by referencing ¶¶ 3, 129, and 130 of the Decree. It then describes Plaintiffs' main complaint with pharmacists' understanding of EPSDT's prescription drug program: When EPSDT recipients seek to fill prescriptions for drugs that are not listed on the Program's Preferred Drug List ("PDL"), pharmacists may fill them only if they have "prior authorization" from the prescribing physicians. If a prescribing physician does not provide the authorization or could not be reached, the pharmacist must dispense a 72-hour emergency supply so that the class member is not deprived of needed medication. Many pharmacists, however, did not know that the stopgap measure was available or treated it as optional and improperly withheld class members' prescriptions.

To remedy the pharmacists' misunderstanding, CAO 637-8 established a detailed series of action items, elaborating on and expanding the requirements found in ¶¶ 124–30 of the Decree. CAO 637-8 is divided into 12 bullet points, of which 9 require specific actions by Defendants. Particularly contested in this appeal are their obligations in bullet points 6 and 10.[15]

---

[14] In March 2012, the EPSDT prescription drug program was transferred from direct state control to the control of managed care organizations. All Texas EPSDT recipients are now served by managed care organizations.

[15] CAO 637-8 also requires Defendants to (1) change the Program's electronic prescription processing system so that it reminds pharmacists of the 72-hour emergency policy; (2) "work with the Texas Pharmacy Association to explain" the policy; (3) make available a PDL database service that doctors may use online or download to a handheld device for reference while providing care; (4) "begin encouraging all Medicaid-enrolled

Bullet point 6 required Defendants to "provide intensive, targeted educational efforts to those pharmacies for which the data suggests a lack of knowledge of the 72-hour emergency prescriptions policy."[16]  In addition to these "intensive, targeted" efforts for particular noncompliant pharmacies, Defendants were also to "continue . . . educational efforts with respect to all Medicaid pharmacies."

Bullet point 10 required Defendants to train staff at their ombudsman's office "about the emergency prescription standards," including "what steps to take to immediately address class members' problems when pharmacies do not provide emergency medicines."

## C.    **Current Proceedings**

In 2012, Plaintiffs moved to enforce the pharmacy aspects of the Decree and CAO 637-8, contending that further action was required because the training efforts had not been effective.  They asked the court to "require that Defendants develop a plan thorough and vigorous enough to eradicate the severe systemic dysfunction" still remaining in the interaction between pharmacies and EPSDT.  Defendants countered, claiming that they had "satisfied the terms of the CAO," and moved to dissolve CAO 637-8 and Decree ¶¶ 124–30 "under the first ground set forth in Rule 60(b)(5)."  They did not seek relief pursuant to the Rule's second or third grounds.

---

pharmacies to also become Medicaid-enrolled providers of durable medical equipment"; (5) provide information about the 72-hour policy and Medicaid's coverage of durable medical equipment every time a pharmacy signs a new, renewed, or amended contract to participate in Medicaid; and (6) encourage managed care organizations to train the nurses who staff their patient hotlines about the 72-hour and durable medical equipment policies.

[16] The previous bullet point had required Defendants to identify these target pharmacies by performing an analysis of all pharmacies' claims histories, which would reveal those that processed zero or a lower-than-expected number of 72-hour emergency prescriptions.  Within two years of completing this analysis, Defendants were to repeat it. The final bullet point in CAO 637-8 required the parties to confer after the second analysis was complete "to determine what, if any, further action [was] required."

No. 14-40048

After a hearing, the district court agreed that Defendants had "substantially complied with the terms of CAO 637-8 and Decree [¶¶] 124–130" and granted their Rule 60(b)(5) motion. The court also found that Plaintiffs had conceded Defendants' compliance with all action items besides those in bullet points 6 and 10.

## II.    Analysis

### A.    Standard of Review

"Consent decrees are subject to Federal Rule of Civil Procedure 60(b)."[17] We review a district court's decision to grant or deny relief pursuant to Rule 60(b) for abuse of discretion.[18] Under this standard, the district court's ruling is "entitled to deference," but we review *de novo* "any questions of law underlying the district court's decision."[19]

Plaintiffs urge that *Frew I*, in which Judge Justice construed various provisions of the Decree, is entitled to deference as "the law of the case." They appear to find this rule in a line of Sixth Circuit cases that apply "deferential de novo" review to interpretations of consent decrees by the judges who initially approved them.[20] We have never followed this rule. Moreover, the law of the case doctrine "generally operates to preclude a reexamination of issues decided on *appeal*."[21] The only decisions that form the law of this case are the Supreme Court's opinion in *Frew III* and our previous panel opinions in *Frew II*, *Frew IV*, and *Frew V*. None of these interpret ¶¶ 124–30 of the Decree; CAO 637-8

---

[17] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 437 (5th Cir. 2011).

[18] *Id.*

[19] *Frazar v. Ladd*, 457 F.3d 432, 435 (5th Cir. 2006).

[20] *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 528 (6th Cir. 2012); *see also, e.g.*, *Brown v. Neeb*, 644 F.2d 551, 558 n.12 (6th Cir. 1981).

[21] *Conway v. Chem. Leaman Tank Lines, Inc.*, 644 F.2d 1059, 1061 (5th Cir. Unit A May 1981) (emphasis added).

did not even exist at the time of *Frew V*. We thus decline Plaintiffs' invitation to apply our law of the case doctrine here.

## B.    Rule 60(b)(5)

Consent decrees, like other judgments, may be modified or terminated pursuant to Rule 60(b)(5), which provides three independent, alternative grounds for relief: "[1] the judgment has been satisfied, released, or discharged; [2] it is based on an earlier judgment that has been reversed or vacated; or [3] applying it prospectively is no longer equitable."[22]  As the party seeking relief, Defendants must bear the burden of showing that Rule 60(b)(5) applies.[23]

The vast majority of motions for modification and termination of consent decrees, especially those involving institutional reform, invoke Rule 60(b)(5)'s third clause.[24]  In contrast, the first clause of Rule 60(b)(5) is raised far less often—typically when there is a dispute over the amount of the judgment[25]—

---

[22] FED. R. CIV. P. 60(b)(5); *see also Horne v. Flores*, 557 U.S. 433, 454 (2009) ("Satisfaction of an earlier judgment is one of the enumerated bases for Rule 60(b)(5) relief—but it is not the only basis for such relief. . . . Use of the disjunctive 'or' makes it clear that each of the provision's three grounds for relief is independently sufficient . . . .").

[23] *See League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011).

[24] *See* 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2863 (3d ed. 2012) ("The significant portion of Rule 60(b)(5) is the final ground, allowing relief if it is no longer equitable for the judgment to be applied prospectively."); *see also Horne*, 557 U.S. at 447 (applying the third clause); *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (same); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 376 (1992) (noting that one party sought modification of a consent decree on the basis of alleged changes in law and fact, which pertain to Rule 60(b)(5)'s third clause).

[25] *See, e.g.*, *Bryan v. Erie Cnty. Office of Children & Youth*, 752 F.3d 316, 321 (3d Cir. 2014); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1274 (11th Cir. 2008); *Zamani v. Carnes*, 491 F.3d 990, 995 (9th Cir. 2007); *Newhouse v. McCormick & Co.*, 157 F.3d 582, 584 (8th Cir. 1998); *Redfield v. Ins. Co. of N. Am.*, 940 F.2d 542, 544 (9th Cir. 1991); *Torres-Troche v. Municipality of Yauco*, 873 F.2d 499, 501 (1st Cir. 1989); *Sunderland v. City of Phila.*, 575 F.2d 1089, 1090 (3d Cir. 1978).

and is almost never applied to consent decrees.[26]  As such, we find very little applicable precedent interpreting this clause.

Defendants urge us to import the principles of *Frew III* to this case, as the Decree implicates the exact same federalism concerns as before.  Plaintiffs' response—that *Frew III*'s hortatory language about state accountability pertains only to Rule 60(b)(5)'s third clause—is technically accurate, but fails to account for Rule 60(b)'s expansive scope:

> We have repeatedly noted that Rule 60(b) is to be given a liberal construction: "In analyzing the 60(b) aspect, [w]e recognize that Rule 60(b) is to be construed liberally to do substantial justice.  The rule is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds."[27]

In light of this statement and the lack of other precedent, we deem it reasonable to consider Defendants' motion with reference to the Supreme Court's unambiguous instructions in *Frew III*.

## C.    Consent Decree Interpretation

Consent decrees are construed according to "general principles of contract interpretation."[28]  "The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties *as expressed*

---

[26] *See* 11 WRIGHT, MILLER & KANE, *supra* note 24, § 2863 ("The first of the grounds set out in Rule 60(b)(5), that the judgment has been satisfied, released or discharged, has been relied on very rarely.").

[27] *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980) (quoting *Laguna Royalty Co. v. Marsh*, 350 F.2d 817, 823 (5th Cir. 1965)).

[28] *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006).  Furthermore, the court "look[s] to state law to provide the rules of contract interpretation."  *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996).  Plaintiffs cite to Texas contract law, and we have previously applied Texas law in cases involving consent decrees concluded between Texas parties.  *See, e.g.*, *City of El Paso, Tex. v. El Paso Entm't, Inc.*, 464 F. App'x 366, 372 (5th Cir. 2012) (per curiam) (unpublished).

*in the instrument.*"[29]   Thus, courts examine the "unambiguous language in a contract" and enforce "'the objective intent' evidenced by the language used."[30] This reliance on the written terms must include consideration of *all* the terms: "[C]ourts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless."[31]   "Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."[32]

Plaintiffs contend that the district court erred in focusing narrowly on Defendants' satisfaction of specific provisions of CAO 637-8 and not considering the Decree's broader goals, as found in ¶¶ 3, 6, and 190.  The purpose of the Decree, according to Plaintiffs, is *results*-oriented: It is not enough for Defendants to perform the required action items mechanically; the court must also find that these actions were effective in improving EPSDT recipients' access to health care.  Plaintiffs conclude that, because the district court failed to construe the Decree as a whole document, it misapplied the rules of contract interpretation and erred as a matter of law.

Plaintiffs' recitation of the rules of contract interpretation is correct, but interpreting the Decree as an entire writing does not give Plaintiffs the victory they seek.  In ¶¶ 3 and 190, the Decree states the uncontroversial position that Plaintiffs, including those served by managed care organizations, are entitled to EPSDT benefits as mandated by Medicaid.  In ¶¶ 4 and 5, the Decree opines that Texas's implementation of EPSDT could and should be improved.  Then, in ¶ 6, the Decree introduces the "changes and procedures" agreed to by the

---

[29] *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (emphasis added).

[30] *Clardy*, 88 F.3d at 352.

[31] *Coker v. Coker*, 650 S.W.3d 391, 393 (Tex. 1983).

[32] *Am. Tobacco Co.*, 463 F.3d at 408 (quoting *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995)) (internal quotation marks omitted).

parties to effectuate this improvement, noting that these actions are in place "[t]o address the parties' concerns, to enhance recipients' access to health care, and to foster the improved use of health care services by Texas EPSDT recipients." These introductory paragraphs do not guarantee specific outcomes; rather, they show that the Decree is aimed at *supporting* EPSDT recipients in obtaining the health care services they are entitled to, by *addressing* concerns, *enhancing* access, and *fostering* use of services.

Defendants therefore fulfill the purpose of the Decree by implementing the broad range of supportive initiatives memorialized *in the Decree.*[33] The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose. In other words, the parties *already agreed* that substantial compliance with this roadmap would achieve their common goal.

To read the Decree as implying a secondary assessment of the impact of each action item would introduce a new requirement to which the parties never agreed. The Decree makes no guarantees of success and sets no results-based milestones; neither do ¶¶ 124–30 establish any objective standard that pharmacists must achieve before Defendants' educational efforts may be considered successful.

Plaintiffs have not pointed to any discrete endpoint for CAO 637-8 or these Decree paragraphs. Indeed, they may *never* be satisfied with Defendants' educational efforts: In their 2012 motion to enforce the Decree and CAO 637-8, Plaintiffs appeared to have given up on pharmacist training entirely. Acknowledging that "[n]o amount of education will cure the pervasive

---

[33] *See id.* at 407 ("The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties *as expressed in the instrument.*" (emphasis added)).

No. 14-40048

dysfunction in Defendants' deeply flawed system," Plaintiffs instead wanted Defendants to "propose a further action plan" to effectuate "systematic change" to the prescription drug program itself.    Neither the rules of contract interpretation nor *Frew III*'s instruction to "promptly" return state programs to state control countenance this rewriting of the Decree.

Plaintiffs also point to the word "effectively" in ¶ 129: Defendants were required to "implement an initiative to effectively inform pharmacists about EPSDT."    Plaintiffs reason that if many EPSDT recipients are still not receiving their prescription drug benefits, Defendants' educational initiative must not have been effective.    Reading ¶ 129 as a whole, however, reveals that "effectively" functions to require that all "presentations," "articles," and "mail out" initiatives conducted by Defendants *convey information* effectively. Paragraph 129 even provides some guidelines for effective communication, instructing Defendants to design mailings "to attract pharmacists' attention" and "explain EPSDT coverage clearly."    Defendants were obligated to communicate information in an effective manner, no more.    To infer a wholesale, results-oriented reevaluation of Defendants' efforts from this one word, taken out of context, would be wholly inconsistent with the rules of contract interpretation.[34]

Finally, Plaintiffs rely heavily on the Ninth Circuit's opinion in *Jeff D. v. Otter*, which held that "[e]xplicit consideration of the goals of [the consent decree], and whether those goals have been adequately served, must be part of the determination to vacate."[35]    But *Jeff D.* is inapposite for two reasons.    First,

---

[34] *See id.* at 408 ("Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract." (quoting *State Farm*, 907 S.W.2d at 433) (internal quotation marks omitted)).

[35] 643 F.3d 278, 289 (9th Cir. 2011).

the Ninth Circuit's reasoning rested on two school desegregation cases,[36] which present unique issues in consent decree jurisprudence,[37] and on a case that appears to have considered the flexible standard for modifying consent decrees, a standard associated with the *third* clause of Rule 60(b)(5).[38]  Thus, *Jeff D.*'s persuasiveness is limited.   Second, the consent decree at issue in *Jeff D.* "provided for continuing jurisdiction by the district court for five years 'or until [the district court was] satisfied by stipulation or otherwise that the *claims as alleged in the Complaint* have been adequately addressed.'"[39]   The *Jeff D.* parties bargained for a termination condition that included an independent assessment by the district court of whether the plaintiffs' complaints had been resolved.   Thus, when the district court vacated the consent decree after assessing compliance with the specific action items only, it did not give the plaintiffs the benefit of their bargain.[40]  Although the Ninth Circuit did not emphasize this fact, we find *Jeff D.* to be distinguishable on this basis.

In conclusion, we reject Plaintiffs' contention that the district court incorrectly interpreted the Decree in deciding Defendants' motion to terminate CAO 637-8 and Decree ¶¶ 124–30.  If the Decree had explicitly guaranteed

---

[36] *See id.* at 288 (citing *Freeman v. Pitts*, 503 U.S. 467 (1992); *Youngblood v. Dalzell*, 925 F.2d 954 (6th Cir. 1991)).

[37] In *Frew V*, Defendants contended that the proper legal standard for terminating consent decrees was that found in the Supreme Court's school desegregation cases, but we expressly declined to rule on that question.  *See Frazar v. Ladd*, 457 F.3d 432, 440 (5th Cir. 2006).   No party relies on the desegregation cases in this appeal.   Owing to school desegregation's unique legal history, the consent decree modification standards articulated in *Freeman* and similar cases may be of limited applicability.  We have cited *Freeman* almost exclusively in other school desegregation cases.

[38] *See Jeff D.*, 643 F.3d at 288 (citing *United States v. City of Miami*, 2 F.3d 1497 (11th Cir. 1993) (considering the "flexible standard" from *Rufo*)).

[39] *Id.* at 281 (emphasis added).

[40] No similar provision exists in the Decree or in CAO 637-8.  The closest analogue is CAO 637-8's instruction for "counsel . . . [to] confer to determine what, if any, further action is required" after Defendants complete the second study of pharmacists' claims history.  If the parties cannot agree, then the court may step in.  There is nothing, however, instructing the court to resolve the dispute with reference to the Decree's overall purpose.

pharmacists' compliance, provided an objective standard for assessing the effectiveness of Defendants' actions, or set termination conditions referencing satisfaction of the Decree's overall purpose, Plaintiffs might legitimately complain about the district court's approach. As it is, the district court did not err in interpreting CAO 637-8 and ¶¶ 124–30 to mandate specific actions only, the performance of which would automatically satisfy the parties' intent in concluding these agreements.

## D.    Dissolution of Consent Decree ¶¶ 124–30 and CAO 637-8

Plaintiffs also challenge the district court's conclusion that Defendants have substantially complied with CAO 637-8 and Decree ¶¶ 124–30. In determining that a party to a contract has fulfilled its contractual obligations, Texas law allows substantial compliance.[41] "Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose."[42]

The district court found that Defendants had substantially complied with the requirements of bullet points 6 and 10 in CAO 637-8 and ¶¶ 124–30 of the Decree. It did not make any specific findings with respect to the other bullet points in the CAO, as it determined that "[a]t the court's hearing on these motions, Plaintiffs acknowledged that Defendants substantially complied with all but two of the paragraphs of CAO 637-8."

Plaintiffs dispute that they made this concession, but their brief acknowledges that, during the hearing on Defendants' motion, their counsel agreed with the court that "some discrete efforts took place." A review of the hearing transcript confirms the propriety of the district court's ruling. Counsel

---

[41] *See Turrill v. Life Ins. Co. of N. Am.*, 753 F.2d 1322, 1326 (5th Cir. 1985).

[42] *Interstate Contracting Corp. v. City of Dall., Tex.*, 407 F.3d 708, 727 (5th Cir. 2005); *see also id.* (noting that substantial compliance is not the legal equivalent of strict compliance if the contract *expressly* calls for the latter).

No. 14-40048

agreed that Defendants had (1) made a Medicaid PDL service available; (2) implemented an electronic system for filling EPSDT prescriptions; (3) worked with the Texas Pharmacy Association to educate its members; (4) conducted two studies of pharmacies' claims histories;[43] (5) encouraged pharmacies to provide durable medical equipment; (6) provided EPSDT materials to pharmacies when concluding new contracts; and (7) encouraged managed care organizations to train their personnel in EPSDT. Although counsel consistently disputed the *effectiveness* of Defendants' efforts, the relevant issue for determining substantial compliance is completion, and Plaintiffs have conceded that Defendants completed all but two of the bullet points in CAO 637-8.

As for the two disputed bullet points, the district court's determination that Defendants have substantially complied with their obligations is consistent with the record. With respect to bullet point 6, which required Defendants to educate pharmacies that filled below-expected numbers of 72-hour emergency prescriptions in an "intensive, targeted" manner, Plaintiffs assert that Defendants' efforts were not sufficiently "intensive." But the district court found Defendants' actions—mailing certified letters to 822 pharmacies, visiting or calling the ones that did not receive the letter, and contacting corporate chain offices—to be sufficient. During oral argument, Plaintiffs' counsel also took issue with the content of the certified letter, contending that it "never told the pharmacists that they *must* provide the 72-hour prescription." According to counsel, the letter left out "the critical part" of the program—that this 72-hour emergency prescription was mandatory, not

---

[43] Plaintiffs' counsel agreed that "[t]hey have conducted two studies fairly close to what the corrective action order required," noting that the studies were "not compliant with [CAO 637-8], but fairly close." The district court did not abuse its discretion to hold that this statement demonstrated a concession of *substantial* compliance. *See id.*

15

discretionary. Thus, "the whole system fell apart" because "the pharmacists think they have discretion, or they don't have to, or it's only permissive that they provide the 72-hour medication." After reviewing the mailing, however, we see no basis for this complaint. The letter told pharmacies that they "should dispense the 72-hour emergency supply"; the enclosed "Texas Medicaid Pharmacists' Guide to Dispensing 72-Hour Emergency Prescriptions" clearly stated that "[f]ederal and Texas law **requires** that a 72-hour emergency supply of a prescribed drug be provided." The district court did not err in concluding that Defendants have fulfilled their obligations under bullet point 6.

With respect to bullet point 10, which required Defendants to train personnel in their ombudsman's office, Plaintiffs' complaints, essentially, are that any evidence of training is insufficiently detailed and conclusional. The district court relied on three declarations from state employees who testified that multiple training sessions occurred for ombudsman's office staff. Although Plaintiffs would prefer the district court not to credit these statements, absent any indicia of unreliability other than Plaintiffs' unsubstantiated accusations of bias, the court's decision to do so is not clearly erroneous.

Finally, Plaintiffs contend that the district court erred in dissolving Decree ¶¶ 124–30 because it did not find that Defendants' actions were effective. As already discussed, the word "effectively" in ¶ 129 applies to the Defendants' communication obligation, not to the participating pharmacies' compliance. The district court rejected Plaintiffs' contention that the phrase "Defendants will implement an initiative to effectively inform pharmacists about EPSDT" meant ensuring that all Texas EPSDT recipients actually received all of their pharmacy benefits. The court noted that Plaintiffs had agreed that Defendants had completed the discrete, information-conveying

No. 14-40048

actions required by this section of the Decree. This determination was not clearly erroneous.

## III.    Conclusion

Defendants have fulfilled their obligations to provide training on and make improvements to EPSDT's prescription drug program. The district court did not abuse its discretion in dissolving CAO 637-8 and ¶¶ 124–30 of the Decree pursuant to Defendant's motion for relief under the first clause of Rule 60(b)(5). Accordingly, the judgment of the district court is AFFIRMED.