# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2022

Lyle W. Cayce
Clerk

No. 21-40028

Carla Frew; Charlotte Garvin, as next friend of her minor children Johnny Martinez, Brooklyn Garvin and BreAnna Garvin; Class Members; Nicole Carroll, Class Representative; Maria Ayala, as next friend of her minor children, Christopher Arizola, Leonard Jimenez, and Joseph Veliz; Mary Jane Garza, as next friend of her minor children, Hilary Garza and Sarah Renea Garza,

*Plaintiffs—Appellants*,

*Versus*

Cecile Young; John William Hellerstedt, M.D.,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 3:93-CV-65

_____

Before Stewart, Haynes, and Graves, *Circuit Judges*.

Jᴀᴍᴇs E. Gʀᴀᴠᴇs, Jʀ., *Circuit Judge*:*

This is the latest appeal in the long-running litigation over Texas' administration of its Medicaid Early and Periodic Screening, Diagnosis, and Treatment program ("EPSDT"). Plaintiffs represent a class of some 1.5 million Texas children eligible for EPSDT services. In 1996, they entered a Consent Decree with various Texas state officials aimed at improving Texas' implementation of its statutory obligations under the Medicaid statute. In 2007, facing multiple enforcement motions from the plaintiffs, Texas further agreed to an eleven-part "Corrective Action Order" ("CAO") aimed at bringing Texas into compliance with the Consent Decree. The district court's eventual dissolution of some of those CAOs has been the subject of two appeals before this court. *See Frew v. Janek*, 820 F.3d 715, 718 (5th Cir. 2016); *Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015). This appeal arises from the district court's termination of the CAOs and Decree provisions governing the State's outreach obligations. Because we agree with the district court that the State is entitled to relief under rule 60(b)(5), we AFFIRM.

I.

In 1993, plaintiffs as representatives of a class of indigent children eligible for EPSDT services sued various Texas officials under 42 U.S.C. § 1983 for violations of federal Medicaid law. This resulted in a 78–page consent decree.[1] In 1998, the district court granted the plaintiffs' motion to enforce the Consent Decree in a lengthy order detailing the State's non-compliance. Although we vacated the district court's decision as violative of

---

* Pursuant to 5ᴛʜ Cɪʀᴄᴜɪᴛ Rᴜʟᴇ 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᴛʜ Cɪʀᴄᴜɪᴛ Rᴜʟᴇ 47.5.4.

[1] A more detailed factual background can be found in this court's numerous previous decisions in this case. *See Frew v. Janek*, 820 F.3d 715, 718 (5th Cir. 2016); *Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015); *Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004).

the State's Eleventh Amendment immunity, the Supreme Court reversed. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004). In 2005, defendants moved to dissolve the Decree in its entirety under rule 60(b)(5). The district court denied that motion, and we affirmed. *Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006)

In 2007, the parties agreed to settle plaintiffs' various enforcement motions by supplementing the Decree with the CAOs, entered in eleven installments by subject matter, all aimed at bringing the State into compliance with the Decree. Compliance with the CAOs is intended to "provide[] a clear potential end point for Defendants' obligations under" each corresponding part of "the Consent Decree." In prefacing the CAOs, the district court stated that it "hopes and expects that by complying with the [CAOs], Defendants will also comply with the Decree."

The State has since improved programming in various areas and, pursuant to the CAOs, the district court has dissolved most or all of six of the eleven CAOs and their corresponding Decree provisions. The plaintiffs have generally contested these dissolutions, prompting two published decisions from this court. In 2015, we affirmed the district court's ruling and reliance on rule 60(b)(5)'s first prong, which permits relief when the decree has been "satisfied, released, or discharged." *Frew v. Janek*, 780 F.3d 320, 323 (5th Cir. 2015) ("*Frew III*"). That appeal concerned the district court's dissolution of the CAO that required the State to "implement an initiative to effectively inform pharmacists about EPSDT." *Id.* at 329. We agreed with the district court that the Decree's language for that program guaranteed plaintiffs certain processes and procedures, but not any specific results. *Id.* at 329-331. And in 2016, this court affirmed in large part the district court's dissolution of the CAO aimed at ensuring class members' access to an "adequate supply of health care providers." *Frew v. Janek*, 820 F.3d 715, 718 (5th Cir. 2016) ("*Frew IV*").

No. 21-40028

One of the CAOs addresses the district court's findings that the State had not fulfilled its outreach duties under the Decree, which directs the State to "effectively inform recipients about the EPSDT program." Those obligations are set out in the Outreach and Informing CAO ("O&I CAO"); in Part III of the Managed Care CAO; and in paragraphs 10-74, 95-96, 176-183, and 193 of the Decree. These obligations are at issue in this appeal.

The parties' main dispute on appeal centers on the O&I CAO's first section, which, as modified in 2009, comprises fifteen paragraphs. It splits the defendants' duties into three phases, requiring defendants to first conduct a study to assess why class members miss checkups, implement five outreach and informing strategies based on the results of the study, and then conduct another study of the effectiveness of those strategies. The CAO defines "effectiveness" as "the impact on checkup participation rates." After completing the second study, the parties are required to meet and confer on whether a "corrective action plan" is necessary. If they agree that it is, defendants must implement the corrective action and then, later, conduct a third study on that action's efficacy. If the parties are unable to agree on the need for corrective action, the CAO calls for the district court to resolve the dispute on a motion filed by either party.

In Phase 1, the State had to conduct both a qualitative and a quantitative assessment. The quantitative assessment must be statistically valid, asking:

> (a) What causes class members to miss medical checkups, dental checkups and/or follow-up visits?
> (b) What are the barriers to receiving medical checkups, dental checkups and/or follow-up visits?
> (c) What can be done to make outreach more effective at helping families overcome barriers that cause them to miss medical checkups, dental checkups and/or follow-up visits?

The O&I CAO ordered the State to give plaintiffs the studies' results, after which the plaintiffs would have fifteen days to offer comment, which the defendants "may accept or reject."

In Phase 2, the defendants were to implement outreach strategies in five specified areas (media, "intensive school-based program[s]," "intensive community-based program[s]," telephone follow-ups after missed appointments, and mail follow-ups after missed appointments." Phase 3 directed the State to use an evaluator to analyze and compare the effectiveness of each of the outreach strategies. "The parties will begin to confer, no later than 30 days following the completion of Phase 3 to determine what kind of corrective action plans, if any, Defendants will implement."

The defendants maintain that they met these obligations. The State performed a study pursuant to the O&I CAO, implemented the five outreach strategies that the O&I CAO prescribed, and performed a follow-up study. But the State took no further corrective action because it deemed that none was necessary. In 2015, the State asked the district court to vacate the outreach-and-informing provisions in the Consent Decree and two CAOs. The State argued in relevant part that it had satisfied those obligations and thus relief was warranted under rule 60(b)(5)'s first prong. The plaintiffs opposed the motion, conceding the State's compliance on only four paragraphs of the Decree. The State's evidence in support of the motion numbered in the thousands of pages.

The district court granted the motion, concluding that the State had satisfied each of its outreach and information obligations in the Decree and CAOs. The district court concluded that the defendants commissioned a statistically valid study and that the O&I CAO did not require the defendants to meet any specific threshold participation levels in the EPSDT program by class members. The district court accordingly rejected the plaintiffs' results-

No. 21-40028

based definition of the term "effective," but the district court nonetheless determined that the State had "demonstrated that [its] outreach and informing efforts [we]re effective" under any arguable "interpretation of the term"—including under the plaintiffs' proposed results-based definition. The district court therefore "vacate[d]" the O&I CAO, Section III of the Managed Care CAO, and ¶¶ 10–74, 95–96, 176–183 and 193 of the Decree "pursuant to Prong 1 of Rule 60(b)(5) of the Federal Rules of Civil Procedure." The plaintiffs timely appealed.

## II.

"Rule 60(b)(5) serves a particularly important function in . . . institutional reform litigation," as "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne v. Flores*, 557 U.S. 433, 447–48 (2009) (internal quotation marks and citations omitted). Courts give rule 60(b)(5) a "liberal construction," *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980), and "district courts must take a flexible approach to motions to modify consent decrees and to motions to modify or vacate institutional reform decrees," *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 379–80, 381 (1992). Flexibility is "often essential to achieving the goals of reform litigation." *Id.* at 381. The defendants bear the burden of showing that rule 60(b)(5) applies. *Frew III*, 780 F.3d at 326–27. This court reviews a district court's decision to grant or deny relief under rule 60(b) for abuse of discretion. *Frazar*, 457 F.3d at 435. But "[u]nlike some of our sister circuits, this Court does not defer to a district court's interpretation of a consent decree. Instead, we review questions of consent decree interpretation de novo." *Frew IV*, 820 F.3d at 723 (citation omitted).

In *Frew III*, we held that the defendants could obtain relief under rule 60(b)(5)'s first prong by demonstrating "substantial compliance" with the CAO and Decree. "Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose." *Frew III*, 780 F.3d at 330 (quoting *Interstate Cont. Corp. v. City of Dallas*, 407 F.3d 708, 727 (5th Cir. 2005)). "As the party seeking relief," defendants "bear the burden of showing" substantial compliance. *Id.* "But in addressing Defendants' request for relief, this Court must take heed of the Supreme Court's admonition that the continued enforcement of the consent decree poses legitimate federalism concerns." *Frew IV*, 820 F.3d at 721.

## III.

Before reaching the merits, we clarify the scope of this appeal. The O&I CAO is comprised of seven sections. The first section is divided into phases, requiring the State to: (i) commission a statistically valid study to assess reasons why class members miss checkups; (ii) then implement five outreach and informing strategies based on the results of the study; and (iii) then conduct another study of those strategies' efficacy, and, if necessary, implement further reforms. The subsequent sections refer to the defendants' other responsibilities regarding outreach, such as mailing and referrals. The district court's order terminated all seven of these sections, in addition to the related paragraphs of the Decree. Although the plaintiffs purport to seek reversal of the order below in its entirety, they offer specific argument only with respect to the first section, concerning the three-phase, study-and-improvement process. The plaintiffs have therefore forfeited any challenge to the district court's decision to terminate the other six sections and related paragraphs of the consent decree. *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("As a general rule, a party waives any argument that it fails to brief on appeal."). The plaintiffs do not contest in their reply brief the defendants' argument to this effect. We examine each of

the plaintiffs' assertions in turn, beginning with the plaintiffs' arguments regarding the State's specific procedural obligations, and ending with the plaintiffs' more structural arguments.

## A.

The plaintiffs first challenge the State's satisfaction of its obligation to research and survey the past shortcomings of its EPSDT program. The plaintiffs argue that the State cannot realistically rectify those shortcomings without understanding them. The O&I CAO directs the State to "use independent, unbiased, and statistically valid methodologies to conduct the assessment of reasons class members miss checkups." The plaintiffs contend that the State commissioned an unreliable survey, asserting that the State's study "excluded all class members who had been eligible for less than 11 months," which resulted in the exclusion of "nearly 70% of class members from participation in the Phase 1 survey." The plaintiffs offer no citation to the record to support this assertion.

We find no error in the district court's decision to credit the State's Phase 1 survey. The State's contractor, Mercer, conducted the study via focus groups and surveys sent to class members. To generate the list of survey recipients, Mercer collected "eligibility data and office visit data" from the State, which data was queried as "Medicaid Class Members aged 0-21 who were eligible as of August 2009 and who were continuously enrolled at least 11 months between September 2008 to August 2009." Plaintiffs seem to use this search parameter as evidence that the survey fatally excluded new class members who, they reason, are most in need of outreach. However, Mercer attested that this data set did not affect the Phase 1 Study, because Mercer did not base its statistical analysis on this data but rather used it as a baseline for the Phase 3 study. Instead, the Phase 1 survey ultimately used all

No. 21-40028

"Medicaid client members, aged less than 21, who were eligible as of December 2010."

Moreover, Mercer sufficiently explained its methodology to satisfy the State's obligation to conduct a statistically valid study. Mercer said it used a multivariable logistic regression model[2] to extrapolate from a "stratified random sample," "account[ing] for non-response bias," and weighted by age, gender, race, aid category, plan type, and geography. Mercer explained that "[t]he baseline EPSDT rates [we]re used as outcome measures to evaluate whether the outreach and informing interventions improve the rates of medical check-ups, dental check-ups, and follow-up care at the individual level." Mercer concluded that controlling for length of enrollment was the best strategy to isolate the effects of the State's new policies, so that the parties could "detect the effects of the intervention at the individual level." Mercer further pointed to peer-reviewed studies using similar methodology in analogous circumstances. The plaintiffs offered no evidence to contest Mercer's assertions or the study's statistical validity. They quoted instead counsel argument in an interrogatory posed to Mercer, while neglecting to mention Mercer's response that "the baseline study population was defined to maximize the ability of the analysis to detect the effects of the intervention at the individual level, by controlling for the length of time in the program."

Faced with this reasonable explanation of the State's study, the plaintiffs offered only counsel argument. The district court in *Frew I* put the plaintiffs on notice that it would rely on the State's unrebutted statistical evidence. *Frew I*, 401 F. Supp. 2d at 675 n.99. Further, plaintiffs did not ask

---

[2] Multivariable regression models are used to establish the relationship between a dependent variable (*i.e.* an outcome of interest) and more than one independent variable.

the district court to order the defendants to re-do the study—they missed the window to contest it—and they base their arguments on the study's results. The district court was therefore correct in discounting the plaintiffs' criticism of the survey, and it did not abuse its discretion in concluding that the defendants had satisfied the O&I CAO's instructions for a statistically valid survey of the reasons class members miss their checkups.

B.

The plaintiffs next argue that the district court's "refusal to require Defendants to develop corrective action plans based on the Phase 3 study renders the study requirement meaningless." They contend that, when viewed "as a whole," the "purpose of the three[-]phase study in the O&I CAO is to inform the development of corrective action plans." Although they acknowledge that the O&I CAO allows for the possibility that no corrective action would be needed after the Phase 3 study, they argue that the district court's "suggest[ion] . . . that [the] corrective action plans were optional deprives the structure of the O&I CAO of meaning." The defendants assert, and the district court held, that because they complied with the Decree, there was no need for further corrective action.

The district court's conclusion is reasonable. The O&I CAO orders the parties to timely confer after the Phase 3 study's completion to "determine what kind of corrective action plans, if any, Defendants will implement." The O&I CAO thus expressly contemplated that no further action would be necessary after completion of the three-phase study-and-improve process. The plaintiffs' argument thus renders the phrase "if any" meaningless. The Phase 3 study's purpose was thus to gauge the defendants' compliance with the Decree's outreach provisions. The Phase 3 study revealed compliance, negating the need for further corrective action. For example, the study showed improved check-up participation by class

members: 87% of survey respondents indicated that their knowledge of EPSDT services was "excellent" or "very good." That is a marked improvement from the state of affairs in 2000, when 60% of respondents reported knowing "very little" or "nothing at all" about the services, *Frew v. Gilbert*, 109 F. Supp. 2d at 599. Accordingly, the plaintiffs have not shown that the district court's "refusal to require Defendants to develop corrective action plans based on the study renders the study requirement meaningless."

## C.

The plaintiffs next argue that the defendants' outreach practices were necessarily ineffective because they "lack" contact information for "30% of the class." The plaintiffs assert that it is impossible for the defendants to conduct outreach for class members whose contact information they lack.

The district court was correct in rejecting the plaintiffs' contact-information argument. The plaintiffs offer no factual or legal citation to support this argument; they derive the thirty-percent figure from a survey that the State commissioned pursuant to the O&I CAO. The contractor sent surveys to 16,611 class members. Some 5,000 of the recipients "were not eligible to participate . . . due to various reasons including: non-working phone numbers (2,266), fax number (7), business (69), wrong number (725), returned mail (2,120), and no Medicaid participant in household (51)." The contractor apparently gleaned the contact information for the surveys' recipients from the plaintiffs, which perhaps undermines the plaintiffs' argument that the 5,000 surveys were returned due to the *State's* lack of diligence.

Regardless, the plaintiffs make no showing that the returned surveys compromised the statistical validity of the study that relied on the survey responses. Further, although the plaintiffs contend that the defendants' inability to contact almost a third of the class necessarily shows the inefficacy

of the defendants' outreach efforts, the defendants introduced evidence that they ultimately were able to contact all but about .29% of the class in their more recent outreach letters. This overall success is enough to show the defendants' substantial compliance with the Decree's outreach provisions. *See Frew III*, 780 F.3d at 330 ("Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose.").

## IV.

The plaintiffs' primary argument on appeal is that the district court used the wrong standard in evaluating the defendants' compliance with the decree. There is little real dispute that the State generally complied with most of its *procedural* obligations under the Decree. In the district court, the State presented thousands of pages of evidence supporting its compliance with the Decree and the O&I CAO's procedural mandates. The plaintiffs did not refute this evidence, but instead resisted the defendants' motion because the State's efforts did not produce a sufficient uptick in EPSDT participation rates. The plaintiffs' main contention on appeal is that "Defendants have not shown through any of the agreed metrics that their efforts are 'effective' and have refused to take corrective actions to improve their outreach and informing efforts or conduct a second study." To support this position, the plaintiffs point to the Decree's language prefacing the outreach and informing obligations: "The parties agree to and the Court orders the following changes to the Texas EPSDT program, policies and procedures *to effectively inform* recipients about the EPSDT program." According to the plaintiffs, the Decree's use of the term "effectively" requires threshold real-world improvements in participation in the EPSDT program, and thus the defendants' compliance with the Decree's procedural mandates is insufficient to merit rule 60(b)(5) relief without greater improvement in participation rates.

Our 2015 decision in *Frew III* disposes of this argument. There, plaintiffs had appealed the district court's termination of the Decree provisions and a CAO "concern[ing] deficiencies in Medicaid-participating pharmacies' understanding of EPSDT." 780 F.3d at 324. The Decree, using language almost identical to the language at issue in this appeal, directed the State to "implement an initiative to *effectively* inform pharmacists about EPSDT." *Id.* at 328-29. The plaintiffs had argued that "the district court erred in focusing narrowly on Defendants' satisfaction of specific provisions . . . and not considering the Decree's broader goals." *Id.* at 328. Plaintiffs specifically asserted that "[t]he purpose of the Decree . . . is results-oriented: It is not enough for Defendants to perform the required action items mechanically; the court must also find that these actions were effective in improving EPSDT recipients' access to health care." *Id.* In addition to the provision ordering "effective[]" outreach to pharmacists, the plaintiffs pointed to the Decree's language introducing the agreed-upon procedures as meant "[t]o address the parties' concerns, to enhance recipients' access to health care, and to foster the improved use of health care services by Texas EPSDT recipients." 780 F.3d at 328.

There, as here, the plaintiffs argued that the Decree and CAOs are results-oriented and therefore the defendants' fulfillment of their obligations depended on showing increased effectiveness. We held, however, that "[t]hese introductory paragraphs do not guarantee specific outcomes; rather, they show that the Decree is aimed at *supporting* EPSDT recipients in obtaining the health care services they are entitled to, by *addressing* concerns, *enhancing* access, and *fostering* use of services." *Id.* (emphasis in original). The Decree is intended to establish a roadmap for achieving better EPSDT services, but the Decree "makes no guarantees of success and sets no results-based milestones." *Id.* at 329. To the extent that the Decree and CAO used the word "effective," those terms were geared towards specific procedures,

but did not guarantee any result in the quality and quantity of EPSDT services. *Id.* Otherwise, there would be no "end-point" for the Decree. *Id.*

The pharmacy provisions at issue in *Frew III* are quite similar to the outreach provisions at issue in this appeal. The Decree's relevant introductory paragraph explains why outreach is "important," but nowhere does it require any specific operational outcome. Nor does the Decree's paragraph 11, which, in language nearly identical to that at issue in *Frew III*, "orders the following changes to the Texas EPSDT program, policies and procedures to effectively inform recipients about the EPSDT program." Those changes include the detailed outreach and informing provisions at issue in this appeal. Like in *Frew III*, paragraph 11 describes the goal as effective outreach, but it does not "explicitly guarantee[]" a particular result "or set termination conditions referencing satisfaction" of that animating goal. *Frew III*, 780 F.3d at 330. In short, it "order[s] the . . . *changes*" that "follow[]" in later paragraphs, rather than any specific result in participation. The State's compliance with the Decree is measured in how closely it follows the Decree's policy mandates, not in the real-world effect of such policies.

In addition to comporting with our law of this case, the defendants' position also finds more support in the Decree's language. The Decree and O&I CAO are chock full of mandatory provisions, rendering conspicuous the absence of any mandated efficacy threshold. For example, the Decree: spends a dozen pages specifying the content, language, and timing of outreach literature; orders the defendants to change the name of its EPSDT program; orders the defendants to create a new format for class members' medical identification cards; mandates conversation topics between "eligibility workers" and class members; orders the establishment of "outreach units" that are "responsible for oral outreach in a geographic area of Texas," and defines those units' responsibilities, staffing, and management; orders the

defendants to communicate and coordinate with other state agencies to enlist their help with the EPSDT program; and directs the methodologies and policies for a pilot outreach program for migrant farmworkers' children in the Rio Grande Valley. The O&I CAO similarly: orders the defendants to implement outreach in five media and specifies the content of each outreach medium; directs the commission and defines the methodologies of a study of the efficacy of the defendants' efforts in those media, specifying the vendors from which the State may solicit bids to conduct the study and the content of the contract with the selected vendor; and defines the content and timing for mailers to class members who miss check-ups. Given the mandatory obligations' exacting specificity, conspicuously absent is any language suggesting that the defendants' compliance with the Decree and O&I CAO depends on any threshold participation levels by class members.

The plaintiffs note that, over this case's long history, the district court and the defendants have used varying definitions of the term "effective," some of which are not inconsistent with the definition the plaintiffs now propose. However, it is the Decree that is at issue in defining "effective," rather than the CAO. *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Under Texas law, . . . a contract is viewed as of the time it was made and not in light of subsequent events."). The parties' understanding of the word "effective" when they negotiated the CAOs, some thirteen years after the Decree's entry, has little bearing on the Decree's meaning. Most importantly, this court's interpretation of the Decree governs, and that interpretation favors the State. *Frew III*, 780 F.3d at 326 ("The only decisions that form the law of this case are the Supreme Court's opinion in *Frew* [] and our previous panel opinions."). Accordingly, we conclude that the Decree "do[es] not guarantee specific outcomes," but rather "establish[es] a clearly defined roadmap for attempting to achieve the Decree's purpose." *Id.* at 328.

V.

The plaintiffs next assert more broadly that the district court incorrectly required them to show that the Decree should be preserved, instead of requiring the State to justify the Decree's termination. They argue for example that the district court "required" them to show that the studies were methodologically unsound "rather than requiring Defendants to demonstrate they complied with the requirement of an independent study or even the[ ]absence of harm." However, it is more accurate to say that the district court first considered whether the defendants had made a prima facie case for relief. Only after concluding that the defendants had done so did the district court ask whether the plaintiffs had rebutted that prima facie case. For example, in evaluating the defendants' compliance with the Decree, the district court said that the defendants had "*demonstrated* that their outreach and informing efforts are effective," while the "Plaintiffs have not *defeated Defendants' showing* that Defendants have substantially complied with their obligations under" the Decree's outreach-and-informing provisions. For that reason, the district court on several issues noted that the defendants' evidence was "unrebutted."

We have found only one instance in which the district court appears to have placed the initial burden on the plaintiffs, and the plaintiffs point to no other examples. In response to the defendants' motion to dissolve the Decree and CAO's outreach and informing provisions, the plaintiffs argued that the defendants were violating the Decree and asked the district court to order another corrective action plan. In evaluating the plaintiffs' request, the district court expressly stated that the plaintiffs "bear the burden of showing that Defendants have violated additional Decree provisions." But that was a correct statement of the law; the proponent of rule 60(b) relief bears the burden of showing entitlement. *See League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011); *Foster v. Centrex Capital*

*Corp.*, 80 S.W.3d 140, 143 (Tex. App.-Austin 2002, pet. denied) (noting that the party alleging breach of contract bears the burden of proof).

## VI.

Last, the plaintiffs argue that the district court should have awarded relief under rule 60(b)(5)'s third prong—the equitable relief provision—rather than the rule's first prong. They assert that the Supreme Court and this court have held in this case that relief from the Decree's provisions "is governed by the equitable clause of Rule 60(b)(5)." They argue that the equitable clause "capture[s]" the "appropriate contours of equity and federalism." It is unclear where the plaintiffs derive their argument that prong-1 relief is unavailable in this case, as this court has twice affirmed the district court's use of rule 60(b)(5)'s first prong in two earlier appeals. *See Frew III*, 780 F.3d at 327 (examining "the first clause of Rule 60(b)(5)); *Frew IV*, 820 F.3d at 720 ("We now address the district court's prong 1 findings."). Accordingly, the plaintiffs' argument lacks merit.[3]

Having found no error in the district court's order, we AFFIRM.

---

[3] The plaintiffs also argue that the district court erred "by 'vacating' the [O&I] CAO and related Consent Decree provisions rather than 'terminating' those provisions as mandated by prior court orders." The plaintiffs, however, did not make this argument below, and they have used the term "vacate" in joint motions before the district court. The plaintiffs therefore have forfeited this argument. *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016) (per curiam).