# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2016

No. 15-40229

Lyle W. Cayce
Clerk

CARLA FREW; CHARLOTTE GARVIN, as next friend of her minor children Johnny Martinez, Brooklyn Garvin and BreAnna Garvin; CLASS MEMBERS; NICOLE CARROLL, Class Representative; MARIA AYALA, as next friend of her minor children, Christopher Arizola, Leonard Jimenez, and Joseph Veliz; MARY JANE GARZA, as next friend of her minor children, Hilary Garza and Sarah Renea Garza,

Plaintiffs - Appellants

v.

M.D. KYLE JANEK; M.D. DAVID L. LAKEY,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal represents another chapter in the long-running litigation over Texas's administration of the Early and Periodic Screening, Diagnosis, and Treatment program ("EPSDT" or "the Program"). Plaintiffs represent a class of children eligible for the Program. In 1996, they entered into a consent decree with various Texas state officials ("Defendants") calculated to improve implementation of the Program. In 2007, the parties further agreed to a "Corrective Action Order" aimed at bringing Defendants into compliance with

No. 15-40229

the consent decree.   In 2013, Defendants moved under Rule 60(b)(5) to terminate a portion of the Corrective Active Order—CAO 637-9—and several associated consent decree paragraphs.  The district court granted this motion, and Plaintiffs now appeal.   We AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

## I.

The terrain is familiar.[1]  In brief, in 1993, Plaintiffs as representative of a class of children eligible for EPSDT sued Defendants under 42 U.S.C. § 1983 for violations of federal Medicaid law, leading to a 78-page consent decree.  In 1998, Plaintiffs' motion to enforce the consent decree was granted, resulting in a lengthy order detailing the district court's findings of non-compliance.[2]  This Court vacated the district court's decision on the basis of Eleventh Amendment immunity.[3]  The Supreme Court reversed.[4]  In 2005, Defendants moved to dissolve the consent decree in its entirety under Rule 60(b)(5).  The district court denied this motion,[5] and this Court affirmed.[6]

In 2007, Plaintiffs again moved to enforce the consent decree.  Rather than litigate the motion, the parties agreed to a Corrective Action Order ("CAO"), consisting of a memorandum opinion approving the overall agreement and "eleven particularized orders for enforcing specific portions" of the consent decree.  The eleven particularized orders are often referred to by their district

---

[1] *See Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483); *Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004).

[2] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000), *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530, *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431.

[3] *Frazar v. Gilbert*, 300 F.3d 530.

[4] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431.

[5] *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432.

[6] *Frazar v. Ladd*, 457 F.3d 432.

court docket number (CAO 637-1, CAO 637-2, etc.).  The memorandum opinion provides that compliance with the orders is to be assessed separately.  Once Defendants comply with a particular order and the part of the consent decree that the order is intended to enforce, "then the Court may terminate that part of the Consent Decree and the Corrective Action Order."   Since 2012, Defendants have moved to terminate three of the eleven orders: CAO 637-3, CAO 637-8, and CAO 637-9.  The district court has granted all three of these motions.  Plaintiffs appealed the termination of CAO 637-8 and CAO 637-9, but not CAO 637-3.  In March 2015, this Court affirmed the district court's order terminating CAO 637-8.[7]  This appeal concerns the district court's order terminating CAO 637-9.

CAO 637-9 is entitled "Corrective Action Order: Adequate Supply of Health Care Providers."   It is organized into thirteen bullet points, most of which direct Defendants to take some action to ensure class members have access to an "adequate supply of health care providers."  In May 2013, Plaintiffs filed a renewed motion to enforce CAO 637-9.  Defendants responded with a joint motion to terminate CAO 637-9 under Rule 60(b)(5) and opposition to Plaintiffs' motion to enforce.  Rule 60(b)(5) provides that "the court may relieve a party . . . from a final judgment, order, or proceeding" if "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."  This list of reasons is "disjunctive," that is "each of the provision's three grounds for relief is independently sufficient."[8]  Defendants argued that they were entitled to relief under both prong 1—because they had "satisfied" the provisions of CAO 637-9—and prong 3—because "applying [CAO 637-9]

---

[7] *Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483).

[8] *Horne v. Flores*, 557 U.S. 433, 454 (2009).

No. 15-40229

prospectively is no longer equitable."[9]  In January 2015, the district court issued a detailed order terminating CAO 637-9.  The court found that relief was appropriate under both prongs 1 and 3.  Plaintiffs timely appealed.

## II.

"We review a district court's decision to grant or deny relief pursuant to Rule 60(b) for abuse of discretion.  Under this standard, the district court's ruling is 'entitled to deference,' but we review *de novo* 'any questions of law underlying the district court's decision.'"[10]

## III.

We first address Defendants' contention that Plaintiffs have forfeited their appeal by failing to challenge the district court's conclusion that relief is warranted under prong 3 of Rule 60(b)(5).  The district court concluded that relief was warranted under *both* prong 1 and prong 3—which this Court and the Supreme Court have squarely held are "independent, *alternative* grounds for relief."[11]  Plaintiffs' opening brief is largely focused upon prong 1, offering only the following limited argument with respect to prong 3: "Plaintiffs address

---

[9] Rule 60(b) provides in full:
(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;

> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

> (4) the judgment is void;

> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

> (6) any other reason that justifies relief.

[10] *Janek*, 780 F.3d at 326 (footnote omitted) (quoting *Frazar v. Ladd*, 457 F.3d at 435).

[11] *Id.* at 326 (emphasis added); *Horne*, 557 U.S. at 454.

4

only the satisfied prong because the District Court relies on the satisfaction of the Decree as a basis for its findings as to the equitable prong. This makes addressing the two prongs separately unnecessary."[12]   Defendants respond that Plaintiffs are "wrong that the district court's prong-three ruling rises or falls with its prong-one ruling, legally or in application"; the district court's "prong-three ruling supports the entirety of the vacatur order"; and "appellate forfeiture suffices to affirm that order and resolve this appeal."[13]   Plaintiffs do not reply.

This Court has held that an appellant forfeits its appeal if the district court provides several alternative grounds for its decision and the appellant fails to brief one of those grounds.[14]   Plaintiffs' treatment of prong 3 was brief, but adequate. Prong 3 provides that "the court may relieve a party . . . from a final judgment, order, or proceeding" when "applying it prospectively is no longer equitable." This Court has recognized "a 2–step test for determining whether modification is warranted" under prong 3:  "First, the party seeking modification must show that 'a significant change either in factual conditions or in law' that 'make compliance with the decree substantially more onerous [or] . . . unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest.' Second, the court must then 'consider whether the proposed modification is

---

[12] Plaintiffs' Corrected Opening Brief at 33 n.104.

[13] Defendants' Brief at 56.

[14] *See Lopez v. Sentrillon Corp.*, 749 F.3d 347, 352 (5th Cir. 2014); *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010); *Atwood v. Union Carbide Corp.*, 847 F.2d 278, 280 (5th Cir. 1988) (per curiam).

suitably tailored to the changed circumstance.'"[15]    The party seeking modification under prong 3 must meet its burden at both steps of this test.[16]

Addressing the second step of prong 3, the district court observed that:

> The proposed modification pursued by Defendants is suitably tailored to the changed conditions because it seeks release only from certain parts of the Decree that have been either satisfied or become obsolete, and because the remaining Decree provisions and CAOs will remain in place "thereby preserving Defendants' responsibilities for ensuring adequate provision of EPSDT services to children under age 21 with Medicaid despite the switch to a managed-care model."

There is no challenge to terminating the "obsolete" paragraphs, so the district court's prong 3 analysis—at least with respect to the consent decree paragraphs and CAO bullet points under review—is dependent upon its conclusion that these provisions have been "satisfied" under prong 1. Plaintiffs are thus correct that prong 3 cannot here serve as an independent ground for affirmance—and they have not forfeited their appeal.

## IV.

We now address the district court's prong 1 findings. Before reaching the merits, it is necessary to clarify the scope of this appeal. CAO 637-9 consists of thirteen bullet points. The district court's order terminated all thirteen of these bullet points, in addition to several related paragraphs of the consent decree.[17] Plaintiffs, however, only offer argument with respect to six of CAO 637-9's bullet points and one of the consent decree's paragraphs. They

---

[15] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 437 (5th Cir. 2011) (alterations in original) (quoting *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367, 383-84 (1992)).

[16] *See id.* at 439 ("Because we find that LULAC and the city failed to meet its burden under the first step, we therefore need not reach the question of whether or not the district court abused its discretion with regard to the second step of the *Rufo* test . . . ."); *see also Frazar v. Ladd*, 457 F.3d 432, 436 (5th Cir. 2006).

[17] The 78-page consent decree is organized into 308 paragraphs.

have, therefore, waived any challenge to the district court's decision to terminate the other seven bullet points and related paragraphs of the consent decree.[18] The six bullet points and one consent decree paragraph at issue create three sets of obligations: (1) bullet points 8-10 order Defendants to perform assessments of the Medicaid provider base and develop plans to address any shortages identified by these assessments; (2) bullet points 6-7 and consent decree paragraph 93 order Defendants to maintain accurate lists of Medicaid providers; and (3) bullet point 5 orders Defendants to maintain adequate reimbursement rates for Medicaid providers.

Plaintiffs challenge the district court's conclusion that Defendants have "satisfied" all of these provisions under prong 1 of Rule 60(b)(5). Case law interpreting prong 1 is limited, but this Court recently clarified the applicable legal principles in our decision addressing CAO 637-8. Defendants can obtain relief under prong 1 by demonstrating "substantial compliance" with CAO 637-9 and the consent decree. "Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose."[19] "As the party seeking relief," Defendants "must bear the burden of showing" substantial compliance. But in addressing Defendants' request for relief, this Court must take heed of the Supreme Court's admonition that the continued enforcement of the consent decree poses legitimate federalism concerns.[20] In all other respects, the consent decree—as

---

[18] *See United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("As a general rule, a party waives any argument that it fails to brief on appeal.").

[19] *Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015) (quoting *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 727 (5th Cir. 2005)), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483).

[20] *Id.* at 327; *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441-42 (2004) ("The state officials warn that enforcement of consent decrees can undermine the sovereign interests and accountability of state governments. . . . The concerns they express are legitimate ones. . . . The federal court must exercise its equitable powers to ensure that when the objects of the

No. 15-40229

a contract agreed to in Texas—is subject to Texas "principles of contract interpretation."[21]

## V.

Bullet points 8-10 address concerns about the adequacy of the Medicaid provider base—that is, the number of doctors providing services to Medicaid recipients. Together, these bullet points order Defendants to do two different things: (1) conduct four assessments of the provider base between 2008 and 2011; and (2) "develop a plan to address" any "shortage[s]" "identifie[d]" by these assessments. Plaintiffs contend that Defendants have failed to do either.

## A.

Bullet points 8-10 are very specific about the timing and content of the four assessments. In 2008 and 2010, Defendants were tasked with completing "major" assessments of the entire provider base. These assessments had to include:

> a) all of those provider types that provide services to class members; b) for each provider type, the number and percent of providers who are "available" to class members; c) for each provider type, the number and percent of providers who have provided any service to any class member; and d) for each provider type, the number of providers who are enrolled in Medicaid but have not provided any services to class members.

In 2009 and 2011, Defendants were to complete "interim" assessments of the "available" provider base. These assessments had to "include the [primary care physician]s for class members, pediatricians, general dentists for class members, orthodontists, psychiatrists for class members, and psychologists for class members." For purposes of both types of assessments, "available" is a

---

decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.").

[21] *Janek*, 780 F.3d at 327 & n.28 (quoting *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006)).

term of art defined in bullet point 10: "'available' means a health care provider who has provided at least one service to at least one new class member in the six months immediately preceding the start date of the assessment."

Plaintiffs assert that Defendants did not properly conduct the four assessments. Though bullet point 10 defines an "available" provider as one "who has provided at least one service to at least one new class member in the *six months* immediately preceding the start date of the assessment," Defendants initially submitted assessments using a definition of "available" that included providers who had provided at least one service in the *twelve months* immediately preceding the start date of the assessment. Plaintiffs complained about this deviation after all four assessments had been completed, and Defendants filed corrected assessments using the proper definition in 2012. Plaintiffs concede that these corrected assessments comply with bullet points 8-10, but they insist that Defendants' "initial refusal to abide by the required six-month data periods, and . . . the resulting simultaneous correction of the data periods for all four annual Assessments denied the court and the class . . . a carefully negotiated opportunity to contemporaneously monitor Defendants' efforts to address provider shortages."[22] Defendants do not dispute that the initial assessments used a different definition of "available," but they argue that they had a good reason for using a broader definition: only six months of data would have been "too small to draw meaningful conclusions about some subspecialties" of providers.[23] They also suggest that Plaintiffs' delay in objecting calls into question the sincerity of their complaints.

The district court expressed "concern[] about the actions taken by both sides with regard to these Assessments." Like Defendants, the court noted

---

[22] Plaintiffs' Reply Brief at 17.

[23] Defendants' Brief at 36.

that Plaintiffs' failure to complain until all four assessments had been completed resulted in significant delay and expense for both parties. But it fully agreed with Plaintiffs that Defendants' initial assessments failed to comply with the explicit requirements of bullet points 8-10. The court also dismissed Defendants' excuse for their non-compliance, explaining that they "should have approached Plaintiffs about their concerns" rather than unilaterally changing the definition of "available." Nevertheless, the district court concluded that Defendants have satisfied this element of bullet points 8-10 because they "have now produced the Assessments as required."

We agree. Plaintiffs contend that the district court's acceptance of the corrected assessments has "deprive[d] the class of the benefit of their bargain" because the corrected assessments do not cure the loss of the opportunity to contemporaneously monitor Defendants.[24] Yet they do not explain how declining to terminate bullet points 8-10 will make them whole. Plaintiffs have lost the opportunity to contemporaneously monitor Defendants regardless of whether bullet points 8-10 are terminated or not. If aggrieved, the proper course would be to ask the district court to sanction Defendants for their initial disregard of the clear terms of bullet points 8-10[25]—not to oppose Defendants' Rule 60(b)(5) motion. At this point in time, Defendants have fully satisfied their obligation to produce four assessments. There is nothing left to do. We conclude that the district court properly terminated the portion of bullet points 8-10 concerning the completion of the four assessments.

---

[24] Plaintiffs' Corrected Opening Brief at 40.

[25] *See, e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. at 439-40 (explaining that "a consent decree may be enforced" through sanctions (citing *Hutto v. Finney*, 437 U.S. 678 (1978))); *Frew v. Hawkins*, 401 F. Supp. 2d 619, 654 & n.57 (E.D. Tex. 2005) (warning Defendants that they had exposed themselves "to equitable sanctions for willful violation of Consent Decree provisions"), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *see also Wis. Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 869 (7th Cir. 1987) (noting that *Hutto* establishes a "district court's inherent power to impose sanctions for violation of its decrees").

No. 15-40229

B.

Plaintiffs also argue that Defendants have failed to "develop a plan to address" any of the shortages identified by the corrected assessments. Defendants "admit that they didn't do anything in response to [the] Assessments," but they urge that the assessments did not identify any "shortage[s]" as that term is used in bullet points 8-10. Plaintiffs counter that Defendants' argument is premised on an incorrect definition of "shortage." The parties' dispute thus reduces to the proper definition of "shortage"—a term defined in neither the consent decree nor CAO 637-9. Before addressing the parties' competing definitions, we pause to note that this dispute raises a legal question that this Court must answer. Contrary to Defendants' suggestion, we may not affirm on the basis that the assessments did not identify any shortages under a *reasonable* definition of that term, even if not the *correct* one. Unlike some of our sister circuits,[26] this Court does not defer to a district court's interpretation of a consent decree. Instead, we review questions of consent decree interpretation *de novo*.[27] Here, we must determine whether Defendants have substantially complied with the obligation to develop plans to address "shortage[s]." We cannot evaluate Defendants' compliance with this obligation until we have answered the antecedent legal question of what that obligation is—i.e., what is a "shortage"?[28] We turn now to this question.

Plaintiffs contend that the assessments did identify several "shortage[s]" because they showed "declines in the supply of providers relative to the number

---

[26] *See, e.g.*, *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 855 (9th Cir. 2007); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371-72 (6th Cir. 1998); *Goluba v. Sch. Dist.*, 45 F.3d 1035, 1038 & n.5 (7th Cir. 1995); *Berger v. Heckler*, 771 F.2d 1556, 1576 n.32 (2d Cir. 1985).

[27] *See Janek*, 780 F.3d 326.

[28] *See E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex. Ct. App. 2007) ("Whether a party's conduct constitutes a breach is a question of law for the court to determine."); *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 868 (Tex. Ct. App. 2001)

of class members needing services."[29]  More specifically, they demonstrated that the ratio of "available" Medicaid providers to class members has decreased for (a) several subspecialties and (b) several geographic regions.[30]  The district court, however, declined to define "shortage" with reference to the number or ratio of providers because "[n]either the Decree, CAO, nor federal Medicaid law establish a number or ratio of providers to recipients that would constitute an 'adequate' supply and fulfill the requirements of the CAO and the objectives of the Decree."  Instead, the district court "look[ed] to other provisions of the Decree for guidance in determining what constitutes an 'adequate' supply of providers."  The court found two provisions particularly instructive: paragraph 197 of the consent decree, which ensures that EPSDT recipients served by managed care providers "do not face unreasonable 1) delay scheduling appointments, 2) delay waiting for appointments once at the office or 3) travel times to get to the office"; and bullet point 1 of CAO 637-9, which requires that all class members have a choice of at least two primary care physicians.  The court chose to define "shortage" based upon these four metrics.  Using this standard, the district court concluded that Defendants have satisfied their obligations under bullet points 8-10 and consent decree paragraph 197. Defendants defend this methodology and urge that the court properly interpreted "shortage" using "functional measures" that capture "whether recipients can actually see appropriate providers without unreasonable delay and travel."[31]

---

("Where the evidence is undisputed regarding a person's conduct under a contract, the court alone must determine whether such conduct shows performance or breach of a contractual obligation. . . . When an issue turns on a pure question of law, we do not give any particular deference to legal conclusions of the trial court and apply a *de novo* standard of review.").

[29] Plaintiffs' Corrected Opening Brief at 18.

[30] *See id.* at 18-27 (summarizing data).

[31] Defendants' Brief at 42.

No. 15-40229

While not without appeal, this interpretation ignores a fundamental principle of Texas contract interpretation: "In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless."[32]  Although it may be reasonable, the district court's interpretation of "shortage" deprives bullet points 8-10 of meaning in two different ways.  First, the language of these bullet points requires Defendants to develop plans to address shortages identified *by the assessments*.  The district court's chosen metrics for identifying a "shortage" may be sensible, but only one—whether all class members have access to two primary care physicians—could be analyzed using the data collected as part of the assessments.  The number of providers, in a vacuum, cannot reveal "1) delay scheduling appointments, 2) delay waiting for appointments once at the office or 3) travel times to get to the office."  The district court's analysis also elides the metric that is the focal point of these assessments, the level of "available" providers.  The parties would have had little reason to negotiate such a detailed definition for this term if they did not intend to use it to identify "shortage[s]."[33]  And second, other provisions already require Defendants to address shortages identified using the metrics relied upon by the district court.  As we have observed, the district court adopted these four metrics from bullet point 1 of CAO 637-9 and consent decree paragraph 197, both of which are independently enforceable against Defendants.  Again, there would have been no reason for the parties to

---

[32] *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (per curiam) (quoting *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002)).

[33] *Cf. Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015) ("The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose."), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483).

negotiate the very detailed language of bullet points 8-10 if these provisions articulated already-existing obligations.

This still leaves the question of the proper definition of "shortage." Defendants insist that Plaintiffs' proposed definition is equally flawed because "provider headcount" cannot tell us anything "in a vacuum."[34] That is, they assert that the ratio of providers to class members is meaningless in the absence of some benchmark. We agree. Plaintiffs argue that various class-member-to-provider ratios show stark shortages, but they do not tell us what an acceptable class-member-to-provider ratio would be. In the absence of this benchmark, the numbers are just numbers—not, as we have emphasized, meaningful parts of "a clearly defined roadmap" "aimed at supporting EPSDT recipients in obtaining the health care services they are entitled to."[35] Both federal and Texas state law support this view. The Department of Health and Human Resources provides numerous incentives for health professionals to practice in underserved areas of the country,[36] which it refers to as "health professional shortage areas."[37] The Secretary designates a region as a "shortage area" if the provider-to-population ratio exceeds a prescribed benchmark.[38] Texas uses a similar procedure to designate "medically underserved populations."[39] If we are to glean anything from Plaintiffs' data, this Court, too, needs a benchmark. We must decline to adopt Plaintiffs' definition of "shortage."

---

[34] Defendants' Brief at 42.

[35] *Janek*, 780 F.3d at 328 (emphasis omitted).

[36] *See, e.g.*, 42 C.F.R. § 23.21-35 (loan program); *id.* § 57.2201-11 (scholarship program); *id.* § 414.67 (incentive payments).

[37] *See* 42 U.S.C. § 254e; 42 C.F.R. § 5.2.

[38] *See* 42 C.F.R. pt. 5 apps. (setting benchmarks).

[39] 25 Tex. Admin. Code § 13.33 (setting benchmark at 3000:1).

No. 15-40229

Instead, we adopt a third definition advanced by neither party. The district court has twice—in published orders—concluded that the data showed a "shortage" of Medicaid providers.[40] In *Frew v. Gilbert*, the court concluded that there was a "shortage" of dentists because the ratio of dentists to class members was higher than the client "load . . . currently being borne by the active dentists."[41] That is, there was a "shortage" because the ratio of providers to class members was 1 to 876 while the evidence demonstrated that most providers cared for less than 100 class members.[42] Given these numbers, all of the class members could not receive the required care. Five years later, in *Frew v. Hawkins*, the district court used this same methodology in concluding that Defendants had not resolved the "shortage" of dentists. This time, the ratio of dentists to class members was 1 to 1,621 while the evidence established that less than one-sixth of the active dentists served more than 1,500 class members.[43] Once again, in these circumstances, it was not possible for all of the class members to receive the required care.

Though we do not owe "deference" to these district court decisions construing the decree,[44] we conclude that they are grounded on and articulate the proper interpretation of "shortage." The point of the consent decree and CAO 637-9 is to "support[] EPSDT recipients in obtaining the health care services they are entitled to."[45] If there are not enough providers to deliver

---

[40] These orders were both entered by Judge William Wayne Justice, who approved the consent decree and presided over this litigation for nearly sixteen years. In 2009, he transferred supervision of the consent decree to Judge Richard A. Schell.

[41] 109 F. Supp. 2d 579, 604 (E.D. Tex. 2000), *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004).

[42] *See id.* at 604 & n.44.

[43] 401 F. Supp. 2d 619, 656-57 (E.D. Tex. 2005), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006).

[44] *See Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483).

[45] *Id.* at 328 (emphasis omitted).

15

these services, then there is a "shortage" of providers. The district court's definition—which compares the provider-to-class-member ratio with the average client load of the relevant class of provider—is an objective way to calculate when there are not enough providers. This methodology also is consistent with the Corrective Action Order's definition of "available." And unlike Defendants' proposed definition, the assessments are well-suited to identify "shortage[s]" using this definition, as both the "major" and the "interim" assessments can be used to calculate the provider-to-class-member ratio that forms one side of the "shortage" comparison. Furthermore, the district court used this definition in two major orders *prior* to the negotiation of CAO 637-9. Indeed, in the memorandum opinion approving the Corrective Action Order, the district court cited to the relevant passages of these two orders as evidence of a "longstanding, severe *shortage* of dentists who take care of class members." It is reasonable to assume that the parties intended to use this same definition in the eleven particularized orders.[46]

Using this interpretation of "shortage," we conclude that the district court erred in terminating the portion of bullet points 8-10 that orders Defendants to develop plans to address "shortage[s]" identified by the assessments. Defendants have put forth no evidence regarding provider-to-class-member ratios or the average client loads of Medicaid providers in Texas. This is understandable given the confusion over the proper definition of "shortage," but Defendants still have the burden to establish that they have satisfied their obligations under Rule 60.[47] We thus vacate the district court's order in part and remand for further proceedings. If the

---

[46] *See, e.g., Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. Ct. App. 2009) ("We look at how a reasonable person would have used and understood the language, by considering the circumstances surrounding the contract negotiations and purposes the parties intended to accomplish by entering into the contract.").

[47] *See Janek*, 780 F.3d at 327.

assessments still do not identify any "shortage[s]," Defendants are free to renew their request to terminate bullet points 8-10. If the assessments do identify "shortage[s]," Defendants of course remain obligated to develop plans to address them.

## VI.

Consent decree paragraph 93 requires Defendants to "maintain updated lists of providers who serve EPSDT recipients." Bullet points 6-7 augment this obligation by, among other things, ordering Defendants to use their "best efforts" to (1) "ensure the accuracy of lists of enrolled health care providers" and (2) "ensure that only accurate information about enrolled health care providers is provided to class members, whether the information is provided by Defendants or by their contractors." These bullet points define "accurate" as follows:

> "Accurate" means that the lists provide accurate and up to date information about each enrolled health care provider, as follows: a) name, b) address, c) telephone number, d) nature of practice (pediatrician, general dentist, pediatric cardiologist, etc.), e) language(s) spoken other than English, f) whether the provider is accepting new patients and any limits on new patients accepted, such as lengthy waits for a first appointment, and g) practice limitations (only newborns, only teens, etc.).

Plaintiffs contend that Defendants have not used their "best efforts" to ensure that the Medicaid provider lists are accurate. The district court disagreed, citing evidence that Defendants have used a variety of means

> to ensure accuracy of the OPL and contractors' lists including "requiring providers in their Medicaid provider agreement to provide timely notification of any changes to their demographic information, deactivating providers who have not submitted a claim or had managed-care encounter activity for a period of 24 months, running nightly queries of the Encounters Online Data Store to update the online provider lookup (OPL) (utilizing data from files submitted by MCOs), and providing incentives to comply

with [their] mandate that providers verify their information on the website every six months."

The district court also noted that managed care organizations ("MCOs")—which serve most of the class members[48]—are contractually

> required to maintain accurate and current online and print versions of their respective lists, to update their lists twice a month, and to update their hardcopy versions quarterly. All Medicaid MCOs report their processes for updating their lists to [a state agency], which monitors and confirms the MCOs' efforts to maintain accurate lists and reports a summary of those efforts to the Court in [periodic reports].

Plaintiffs assail the district court's conclusion that Defendants are exercising their "best efforts" on a number of different grounds. They first challenge the evidence of "best efforts" offered by Defendants. Plaintiffs assert that the district court improperly relied on the self-serving declarations of Defendants' employees and their contractors "that they flawlessly and systematically go to great efforts to assure that all their provider directory information is accurate and up to date."[49] This Court, however, rejected similar "unsubstantiated accusations of bias" in our recent decision concerning CAO 637-8.[50] Plaintiffs also argue that the district court erroneously relied on Defendants' contracts with their MCOs in the absence of any evidence that these contractual obligations are actually enforced. This assertion is simply

---

[48] R.74151 ("Defendants have represented to the court that 91% of children on Medicaid in Texas are now served by MCOs."); *see also Janek*, 780 F.3d at 325 n.14 ("All Texas EPSDT recipients are now served by managed care organizations.").

[49] Plaintiffs' Corrected Opening Brief at 53.

[50] *See Janek*, 780 F.3d at 331 ("The district court relied on three declarations from state employees who testified that multiple training sessions occurred for ombudsman's office staff. Although Plaintiffs would prefer the district court not to credit these statements, absent any indicia of unreliability other than Plaintiffs' unsubstantiated accusations of bias, the court's decision to do so is not clearly erroneous.").

No. 15-40229

belied by the record; the district court noted several different ways in which Defendants ensure compliance with these contracts.[51]

Plaintiffs next suggest that there are several issues with the procedures used to ensure the accuracy of the provider lists. Plaintiffs note that the incentives used to encourage providers to update their information only impact providers who are *interested* in serving class members.[52] Plaintiffs also claim that the provider lists are "very inaccurate and frustrating to use" because providers are not removed unless they not have provided any services for two years while the assessments have demonstrated that many of these providers are "not in fact available."[53] They further offer evidence assertedly demonstrating the inadequacy of these procedures. This evidence includes declarations from two mothers "who describe inaccuracies and discrepancies in [the] directories," affidavits from two employees of a doctor who claim they are unable to remove their employer from the provider lists, an affidavit from a "clerical employee of counsel" who struggled to find a listed doctor willing to take a new Medicaid patient, and records reflecting dozens of complaints from class members unable to find providers.[54] Plaintiffs contend that this evidence compels the conclusion that Defendants are not using their "best efforts."

We disagree. Plaintiffs overstate Defendants' obligation. In their briefing, Plaintiffs contend that "best efforts" "must include reasonable efforts under the circumstances up to but not including efforts that would put the

---

[51] *See* R.74162 ("HHSC monitors and confirms the MCOs' efforts to maintain accurate lists and reports a summary of those efforts to the Court in the MCO Activities Reports in each QMR. HHSC also performs periodic random checks of provider director[ie]s. An MCO that fails to comply is put on a corrective action plan until improved." (footnotes omitted)).

[52] The incentives prevent providers from accessing online claims submission or client eligibility checks unless they have updated their information within the past six months. As Plaintiffs urge, this is likely of no moment to a provider who does not serve class members.

[53] Plaintiffs' Corrected Opening Brief at 57-58.

[54] *Id.* at 27-28, 54-55.

19

promisor into insolvency."[55]  The case law does not support such a standard. "Courts construing a best efforts provision that does not specify the performance to be required commonly hold the promisor to the standard of the diligence a reasonable person would use under the circumstances."[56]  And the question of "[w]hether a contractual best efforts obligation has been met or fulfilled is usually a question of fact because it is heavily dependent upon the particular circumstances of the case."[57]  Accordingly, this Court may only reverse if it is "left with the definite and firm conviction" that a "reasonable person" would be doing more to ensure the accuracy of the provider lists.[58]

Plaintiffs cannot demonstrate error under this standard of review.  The affidavits and other evidence of inaccuracies suggest that the provider lists are not perfect, but they do not demonstrate any widespread issues.  Plaintiffs' more systemic criticisms are similarly unavailing.  The incentives used by Defendants to ensure the accuracy of the lists may not be effective in themselves, but they are just one of many overlapping measures.  There is also nothing unreasonable about waiting two years to take providers off the lists. As Defendants explain, this practice helps ensure that providers in rarely used specialties or remote locales are not improperly removed for lack of activity. To the extent Plaintiffs suggest that Defendants *must* employ "the agreed definition of an 'available' provider" to determine when a provider should be

---

[55] *Id.* at 53 (citing *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613-14 (2d Cir. 1979)).

[56] *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 171 (Tex. Ct. App. 2012) (collecting cases); *see also Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir. 1987) (noting that some courts have held that "best efforts" is synonymous with "good faith"); *United States v. Bd. of Educ.*, 799 F.2d 281, 292 (7th Cir. 1986) (noting that courts "often have to be flexible in determining the amount of performance that would constitute best efforts").

[57] *DaimlerChrysler Motors Co.*, 362 S.W.3d at 174 (collecting cases).

[58] *See United States v. Haines*, 803 F.3d 713, 744 (5th Cir. 2015) (quoting *United States v. Akins*, 746 F.3d 590, 609 (5th Cir. 2014)).

removed from the lists, this suggestion is misplaced.[59]   Although bullet points 8-10 use this term, bullet points 6-7 do not.[60]   This Court must interpret CAO 637-9 according to its "plain meaning" and cannot rewrite bullet points 6-7 to include this highly technical term.[61]   We affirm the portion of the district court's order terminating bullet points 6-7 and consent decree paragraph 93.

### VII.

Bullet point 5 orders Defendants to take a number of different steps to ensure that reimbursement rates for Medicaid providers are "adequate."  The district court concluded that Defendants have satisfied this bullet point in its entirety.  Plaintiffs challenge this conclusion only with respect to one sentence: "Payment levels will be sufficient to attract enough providers to serve the class, and comply with the Decree and this Order with respect to all class members, whether or not they are enrolled in managed care."  They argue that payment levels are not "sufficient" given the "widespread provider shortages" identified by the assessments.[62]   That is, they contend that (1) "adequate rates are whatever is necessary to provide the check ups and follow up care to all of the class members" and (2) rates must be inadequate because many class members are not receiving these services.[63]

Defendants' main response is that this argument fails on its own terms because there are no provider shortages.  This contention, however, is based upon the same erroneous interpretation of "shortage" we earlier rejected.  Defendants also repeat the district court's observation that "Plaintiffs have put

---

[59] Plaintiffs' Reply Brief at 29.

[60] *See Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different language to address parallel issues (i.e., indemnification obligations regarding two different facilities), it is reasonable to infer that they intend this language to mean different things.").

[61] *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008).

[62] Plaintiffs' Corrected Opening Brief at 59.

[63] Plaintiffs' Reply Brief at 25-26.

No. 15-40229

forth no evidence of what they contend rates should be to attract enough providers to serve the class. Further, Plaintiffs have not pointed to any evidence that the small rate decreases in 2011 have decreased the provider supply." But Defendants, not Plaintiffs, have the burden to prove that bullet point 5 has been satisfied.[64] We, therefore, must conclude that the district court erred in terminating the challenged sentence of bullet point 5. As with bullet points 8-10, we vacate this portion of the district court's order and remand for further proceedings.

## VIII.

For the reasons stated above, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

---

[64] *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015), *cert. denied*, 84 U.S.L.W. 3224 (U.S. Feb. 29, 2016) (No. 15-483).