# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 30, 2021

Lyle W. Cayce
Clerk

No. 20-40575

SAN ANTONIO BAY ESTUARINE WATERKEEPER; SYLVIA DIANE
WILSON,

*Plaintiffs—Appellees*,

*versus*

FORMOSA PLASTICS CORPORATION TEXAS; FORMOSA PLASTICS
CORPORATION USA,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:17-CV-47

Before KING, SMITH, and HAYNES, *Circuit Judges*.

PER CURIAM:[*]

This case concerns a dispute between Formosa Plastics Corporation
Texas and Formosa Plastics Corporation U.S.A. (jointly, "Formosa") and
San Antonio Bay Estuarine Waterkeeper and Sylvia Diane Wilson (jointly,

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-40575

"San Antonio Bay") over the interpretation of three paragraphs in a Consent Decree the parties entered into to settle San Antonio Bay's Clean Water Act ("CWA") claims. Specifically, the parties disagree about what triggers Formosa's payment and reporting obligations—new, post-Consent Decree discharges of plastics (as Formosa contends) or the presence of any plastics, regardless of when they were discharged (as San Antonio Bay contends). The district court resolved the dispute in favor of San Antonio Bay. For the following reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

## I.    Background

San Antonio Bay sued Formosa under § 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1),[1] for illegally discharging plastic pellets and other materials through its stormwater and wastewater into Cox Creek and Lavaca Bay in violation of Formosa's Texas Pollutant Discharge Elimination System ("TPDES") permit.[2] Formosa's permit prohibited it from discharging "floating solids or visible foam other than trace amounts." The district court held a bench trial and found that Formosa violated its permit because the plastics discharged exceeded "trace amounts" as the district court construed that term.

---

[1] Under this provision, "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

[2] Under the CWA, the "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source" or "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12).

No. 20-40575

Following the district court's ruling, the parties agreed to settle San Antonio Bay's CWA claims, executing a Consent Decree to that effect.[3] Relevant here, paragraphs 36, 37, and 38 of the Consent Decree concerned the documentation of discharges by a designated third party (the "Monitor"), as well as Formosa's payment and reporting obligations for its discharges. These paragraphs are located in a subsection entitled "Monitoring, Reporting, and Future Mitigation Payments."

Paragraph 36 focuses on the circumstances that would result in a violation of Formosa's discharge permit and a corresponding penalty payment. It provides:

> If either Formosa or the Monitor documents any Plastics resulting from sampling at the WSM for Outfall 001 or upstream of containment Booms, including on the upstream shores or in the water, for outfalls discharging into Cox Creek, and including discharges of Plastics found by the Monitor in accordance with paragraph 37, Formosa, subject to any claim by Formosa of a Force Majeure Event or Force Majeure Events, is in violation of its discharge permit and Formosa will, within thirty (30) Days of learning of the violation, pay into the Mitigation Trust . . . .

The paragraph also includes a payment schedule "[f]or discharges in calendar year[s]" 2019 to 2024 (and after).

Paragraph 37 focuses on the documentation of discharges. It provides:

> Plaintiffs or other concerned citizens may send documentation of Plastics outside of Formosa's outfalls in Cox Creek or on the shores of Cox Creek for outfalls discharging into Cox Creek to the Monitor for review. If the Monitor determines the

---

[3] The Consent Decree acted as the "full and final settlement of the civil claims for violations of the [CWA] . . . , as alleged in the complaint . . . up through the date of entry of th[e] Consent Decree."

submitted documentation demonstrates new discharges of Plastics not already identified, the Monitor will add the new discharges demonstrated by the citizen documentation to the discharges documented by the Monitor, as provided in paragraph 36.

Finally, paragraph 38 focuses on Formosa's reporting obligations to state officials, cross-referencing the discharge provisions in paragraph 36. In relevant part,[4] it provides:

> When there has been a discharge of Plastics, as determined pursuant to paragraph[] 36, within twenty-four (24) hours of Formosa learning of the discharge, Formosa will report each event as a permit violation to the Texas Commission on Environmental Quality ("TCEQ") identifying the water body (Cox Creek or Lavaca Bay) where Plastics were discharged . . . .

Beyond these paragraphs, the Consent Decree required Formosa to pay $50 million over five years for "Mitigation Projects to the Matagorda Bay Mitigation Trust"; instituted various procedures and remedial measures to address past, current, and future discharges; and mandated zero discharges from Formosa's Point Comfort Plant. If violations were found, then Formosa was required to pay into the Mitigation Trust.

The parties initially worked together to implement the terms of the Consent Decree, but they disagreed over whether Formosa's payment and reporting obligations are triggered only on a "new discharge" of plastics (as Formosa contended) or whether they are triggered on the "visual detection" of plastics irrespective of when those plastics had actually been discharged from a Formosa property (as San Antonio Bay contended).

---

[4] Paragraph 38 also discusses Formosa's obligation to "propose a new reporting policy." That portion of paragraph 38 is not relevant to the present dispute.

The district court agreed with San Antonio Bay.[5]  It held that the presence of plastics outside of Formosa's outfalls constituted violations of the zero-discharge mandate set out in the Consent Decree and Formosa's TPDES permit.  The district court also determined that, in analyzing whether plastics were present, the Monitor was required "to simply document[] the presence of Plastics," not "to determine source or cause, or justify his findings based on a found discharge of water(s)."  Consequently, the district court placed on Formosa the "burden to refute that the Plastics found [were] not the result of a new release"; Formosa could petition for a refund if it carried that burden.  Formosa timely appealed.[6]

## II.    Jurisdiction & Legal Standard

The district court had federal question jurisdiction over this case under 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331, and appropriately retained jurisdiction under the terms of the Consent Decree.  We have jurisdiction over this interlocutory appeal under the collateral order doctrine.[7]  *See In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

---

[5] The district court later issued an amended order to correct various factual errors but did not change its substantive holding.

[6] Formosa also moved to stay the payment and reporting penalties pending appeal. We granted a temporary administrative stay pending resolution of this appeal.

[7] Jurisdiction under the collateral order doctrine can be invoked "when an order: (1) conclusively determined the disputed question, (2) resolved an important issue separate from the merits of the case, and (3) is effectively unreviewable on appeal from a final judgment." *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).  Here, the district court's amended order conclusively resolved an important and disputed issue separate from the merits of Formosa's CWA liability—the scope of Formosa's penalty obligations under the Consent Decree—which is effectively unreviewable on appeal from a final judgment.

We review questions regarding consent decree interpretation de novo. *Frew v. Janek*, 820 F.3d 715, 723 (5th Cir. 2016). Because the Consent Decree at issue was agreed to and executed in Texas, it is "subject to Texas principles of contract interpretation." *Id.* at 721 (internal quotation marks and citation omitted). Under Texas law, words and phrases are given their "ordinary and generally accepted meaning." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) (per curiam) (internal quotation marks and citation omitted). The overall goal "in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). Accordingly, "courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In addition, a court must consider the contract "in light of the circumstances present when the contract was entered" to determine whether a given term is ambiguous. *Phila. Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 587 (Tex. App.—Fort Worth 2004, no pet.).

Taking these considerations together, "[i]f a written contract is so worded that it can be given a definite or certain legal meaning," the contract is unambiguous, and that interpretation of the contract governs. *CBI Indus.*, 907 S.W.2d at 520. If, however, the language "is subject to two or more reasonable interpretations," then the relevant term is ambiguous, and courts may "consider the parties' interpretation" and "admit extraneous evidence to determine the true meaning of the instrument." *Id.*

## III.    Discussion

The parties' dispute primarily concerns the interpretation of paragraph 36, as informed by the text of paragraphs 37 and 38. These

paragraphs articulate Formosa's mitigation payment and reporting obligations, as well as the Monitor's documentation role.  Formosa maintains that paragraph 36 concerns only "new discharges"—not the "mere presence"—of plastics, such that Formosa's payment and reporting obligations arise only after the Monitor determines a given plastic was discharged *after* the Consent Decree's effective date.  San Antonio Bay responds, in effect, that paragraph 36 does not require the Monitor to determine whether a given plastic has been newly discharged, and, even if it did, the mere presence of plastics is a satisfactory shorthand to conclude that such a discharge occurred.  Upon review of the entire Consent Decree, we conclude that Formosa's interpretation is the only reasonable one.

First, the text of the operative provisions indicates that only new, post-Consent Decree discharges trigger Formosa's payment and reporting obligations.   Paragraph 36, for one, contains several forward-looking references.  It refers to "discharges of Plastics" in the present sense— suggesting that the parties contemplated only active discharges, rather than past discharges.  Similarly, the paragraph refers to a Force Majeure Event as a possible exemption from Formosa's payment liability, implying that an unforeseen event *in the future* could cause a "discharge[]" of plastics.[8] Critically, paragraph 36 contains a mitigation payment schedule which includes penalty payments for "discharges" only for the years *following* the Consent Decree, demonstrating that the parties did not contemplate pre-Consent Decree discharges triggering Formosa's payment and reporting

---

[8] A Force Majeure Event is an unanticipated *future* occurrence; as defined in paragraph 11 of the Consent Decree, it is an "event" caused "solely by an act of God, war, strike, riot, or other catastrophe" for which Formosa must take reasonable steps to "*prevent*" from causing discharges.

obligations.  This portion would make little sense under San Antonio Bay's reading.

Paragraphs 37 and 38 contain similar language.  Paragraph 37 refers to "discharges of Plastics" and "discharges document[ed] by the Monitor, as provided in paragraph 36."[9]  Paragraph 38 also contemplates a "discharge of Plastics" (characterizing it as an "event").  In particular, paragraph 38's use of the phrase "[w]hen there has been a discharge of Plastics"—coupled with a time sensitive twenty-four-hour reporting obligation—appears to contemplate that a discharge is an "event" in the future.  The word "event" itself also suggests some kind of action to trigger liability, rather than the passive presence of something.  Further, paragraph 38's language requiring the identification of "where the Plastics were discharged" indicates that the parties expected the specific location of the initial discharge to be noted by Formosa.  If the discharges referenced in paragraph 38 referred to *past* discharges, it might be impossible to make this determination insofar as some plastics could have moved over the years.  In short, paragraph 38's emphasis on "when" and "where" plastics were discharged suggests that the mere presence of "what" was being discharged (that is, plastics) is not enough to trigger Formosa's reporting obligation.

Second, we observe that the overall structure of the Consent Decree suggests that the parties contemplated only post-Consent Decree discharges as triggers for Formosa's payment and reporting obligations.  In general, the Consent Decree addresses past discharges and future discharges in separate

---

[9] Paragraph 74 also cross-references paragraph 36, though it is not located in the same subsection.  Notably, paragraph 74 allows for Formosa to request termination of the Consent Decree "after the Monitor, Plaintiffs, and cleanup records have all documented no discharges of Plastics as defined in paragraph 36 . . . for six (6) consecutive months."  Thus, paragraph 74 (like paragraph 37) suggests that paragraph 36 contemplated that *active discharges*, not the mere presence of plastics, triggered Formosa's obligations.

ways and in separate parts of the agreement. Of particular importance is the "Remedial Measures" section, which contains five subsections (A through E), of which Subsections A through C are the most relevant to this dispute.[10] Notably, paragraphs 36, 37, and 38 are in Subsection B.

Each subsection deals with a different aspect of the overall remediation scheme. Subsection A ("Engineering Changes") designates an "Engineering Consultant" to produce a plan to update Formosa's facility "to prevent the discharge of Plastics," including "plans to address deficiencies in Formosa's current system." Subsection B ("Monitoring, Reporting, and Future Mitigation Payments") designates a Monitor to document relevant information at certain locations to determine whether Formosa must make additional mitigation payments. Lastly, Subsection C ("Remediation of Past Discharges") designates a Remediation Consultant to review remediation methods, develop and propose a plan to remove plastics, keep daily records of cleanup activities, and create a final report.

In short, each phase of Formosa's remedial efforts is controlled by a designated individual with different responsibilities. Because Subsection B (which contains paragraph 36) focuses on monitoring Formosa's current progress and *future* mitigation payments, the location of paragraph 36 in that subsection suggests that it has a similar focus. On that score, perhaps more telling than where paragraph 36 is located is where it is *not* located: specifically, it does not appear in Subsection C, which deals with "Past Discharges."[11] Thus, the location of paragraph 36 suggests that the focus of

---

[10] Subsections D and E concern mitigation issues largely unrelated to the discharge dispute; they address "Permit and Mitigation Terms" and "Environmental Mitigation Projects."

[11] Subsection C includes a specific provision concerning the notification of "the Remediation Consultant of the presence of Plastics in the Cox Creek or Lavaca Bay so those Plastics can be cleaned up." This provision, as well as its surrounding provisions, does not

this provision is on post-Consent Decree discharges only; the failure to remediate past discharges would be a separate violation addressed by a different subsection.

We conclude the Consent Decree, taken as a whole, is therefore unambiguous.  This conclusion is confirmed by the parties' intent in the Consent Decree itself.  Simply put, it makes no sense for Formosa to agree to pay $50 million to obtain a "full and final settlement" of the CWA claims, "up through the date of entry of th[e] Consent Decree," if it was subject to continuing liability for past discharges of plastics, even if those discharges were limited to a particular geographic area.[12]  Indeed, if the mere presence of plastics in the designated area were sufficient to trigger Formosa's penalty payment and reporting obligations, then Formosa would be in perpetual violation of its discharge permit, regardless of the amount or age of those plastics.  That would effectively mean that the Consent Decree would continue forever if *any* plastics remained in the environment, even though the parties specifically contemplated that the Consent Decree would terminate, upon request, after "no *discharges*" were documented for six months.  Such an interpretation is at odds with the parties' intent to settle their dispute regarding the CWA claims—especially when their goal for the

mention penalty payments, nor does it cross-reference paragraph 36.  If past discharges subjected Formosa to such penalties, why did the Consent Decree not provide for it (or reference it) in this subsection?  The omission of such a provision supports the conclusion that past discharges were not considered for penalty payment treatment under paragraph 36.

[12] Formosa previously argued that it had no CWA liability because plastics outside the outfalls might be "latent[,]" the same plastics "seen on a previous visit" to that outfall, or a "legacy" of "25ish years" of discharges of plastics.  Given Formosa's past position, it is unlikely that Formosa would subject itself to liability for these past discharges while paying $50 million for a settlement.

No. 20-40575

remediation of past discharges was simply the "removal of most Plastics from the environment . . . ."[13]

Accordingly, we REVERSE and REMAND for further proceedings.[14] On remand, the district court is instructed to reconsider the responsibilities of the Monitor in light of our conclusion that the Consent Decree, as a whole, contemplated only post-Consent Decree discharges.

---

[13] San Antonio Bay highlights what it sees as notable omissions casting doubt on the conclusion that the parties contemplated liability for only post-Consent Decree discharges—including, for example, that the Consent Decree does not specifically describe how the Monitor should determine whether a given plastic is the result of a pre- or post-Consent Decree discharge. Although we acknowledge that the Consent Decree does not specify such a process, that omission is not dispositive given the *actual* language in the Consent Decree, indicating that Formosa's obligations trigger only on post-Consent Decree discharges. *See Gonzalez*, 394 F.3d at 392 (noting that "courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless" (internal quotation marks and citations omitted)).

[14] The parties also dispute whether the district court modified the Consent Decree by creating a burden shifting and refund framework not mentioned in the actual Consent Decree. Because this modification was made in light of the district court's interpretation that the mere presence of plastics in certain locations was enough to trigger Formosa's payment and reporting obligations, we necessarily reverse it, along with the rest of the district court's order.